```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN  DISTRICT OF TEXAS
 2                       DALLAS  DIVISION
 3    POSITIVE SOFTWARE SOLUTIONS,  )
      INC.,                         )
 4                  Plaintiff,      )
                                    )
 5    VS.                           )        CIVIL ACTION NO.
                                    )        3:03-CV-0257-N
 6    NEW CENTURY MORTGAGE CORP.,   )
      et al.,                       )
 7                  Defendants.     )
 8
      IN RE:  BARRY C. BARNETT      )        MISC. ACTION NO.
 9    and OPHELIA F. CAMINA,        )        3:07-MC-93-N
                    Respondents.    )
10                                  )        APRIL 19, 2008
11
12
13         TRANSCRIPT OF MOTIONS FOR SANCTIONS HEARING
             BEFORE THE HONORABLE DAVID C. GODBEY
14                UNITED STATES DISTRICT JUDGE
15
16    APPEARANCES:
17    For Positive Software:    MR. MICHAEL W. SHORE
                                MR. ALFONSO GARCIA CHAN
18                              MS. SHERRY L. TALTON
                                Shore Chan Bragalone, LLP
19                              901 Main Street, Suite 3300
                                Dallas, Texas  75202
20                              (214) 593-9140
21    For the Respondents:      MR. DAVID J. BECK
                                MR. MURRAY FOGLER
22                              Beck Redden & Secrest
                                1221 McKinney Street, Ste. 4500
23                              Houston, Texas  77010
                                (713) 951-3700
24
25
```

Page 2

```
 1    APPEARANCES CONTINUED:

 2

 3    For the Respondents:        MR. ROD PHELAN
                                  Baker Botts
 4                                2001 Ross Avenue, Suite 600
                                  Dallas, Texas   75201-2980
 5                                (214) 953-6609
 6    Court Reporter:            Linda J. Robbins, CSR #890
                                  U.S. District Court Reporter
 7                                Chambers of Judge David C. Godbey
                                  1100 Commerce Street, Rm. 1358
 8                                Dallas, Texas   75242
                                  (214) 748-8068
 9

10

11    Proceedings reported by mechanical stenography, transcript
12    produced by computer.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1                        P R O C E E D I N G S

2                         DECEMBER 19, 2008

3              THE COURT:  Be seated.  Good morning.

4              MR. SHORE:  Good morning, Judge.

5              MR. BECK:  Morning, Your Honor.

6              THE COURT:  I've given you-all two hours per side,

7      but you don't have to use it all.  I think we'll take about

8      a ten-minute break at the close of plaintiff's opening and

9      then a short break after -- or movant's opening, a short

10     break after the response.

11         So movant may proceed.

12             MR. SHORE:  May it please the Court, Judge Godbey,

13     we're here on a long -- a much anticipated and long awaited

14     hearing on the motion for sanctions.  And what we would

15     like to do here today is give you a summary -- and there is

16     a notebook in front of you that I will be following pretty

17     judiciously.  And I've also provided a copy for your clerk

18     and the court reporter.

19         Opposing counsel also will have a copy that they can

20     follow along with.  However, obviously if at any time you

21     want to interrupt and ask any question or divert me, I'll

22     be happy to do so and then struggle mightily to recover

23     back to my presentation.

24         We're going to begin, and it's -- it's sort of an

25     outline summary as we're going to begin talking about the

Linda J. Robbins, CSR, RDR, CRR

Page 4

1    2000 version of LoanForce.  And as an overview, it's our

2    contention that the respondent suppressed the 11/9/2000

3    version of LoanForce in order to win the arbitration.

4        We now know that there are actually two versions of the

5    11/9/2000 version of LoanForce basically from their filings

6    earlier this week.  One is the Norment version which was

7    suppressed and remains suppressed.  And another is a -- is

8    a version that I believe was blankly inadvertently produced

9    and its production was clouded, hidden, and misrepresented

10   in writing to us and to the arbitrator so that it would not

11   be discovered or perhaps it was inadvertently produced like

12   the Norment analysis.  But we'll get into that in a minute.

13       Respondents also suppressed what is known as a VSS

14   database and versions of LoanTrack, LoanTrack-2, and MLAS

15   in an effort to conceal infringement.

16       The also suppressed numerous documents indicating Udo

17   Pooch's written opinions that were inconsistent with his

18   opinions at trial and also would have revealed his bias

19   and lack of credibility.

20       They also misrepresented the role of LoanForce in

21   the development of mLAS.  They repeatedly told this Court

22   that mLAS was developed in a clean room environment by

23   programmers who had absolutely no access to LoanForce.

24   They knew that was not true, their clients knew it was not

25   true, and the documents discovered since the -- the case

 1   clearly indicate that was not true.

 2      That was done to avoid a broad preliminary injunction

 3   which the documents from their client now demonstrate they

 4   expected to be issued and were taking all measures necessary

 5   to keep it from being broad enough to actually harm their

 6   business.

 7      They also misrepresented to the Court repeatedly that

 8   New Century had been purged of LoanForce.  This was also

 9   part of the efforts to limit the preliminary injunction.

10   And later, when they learned, even assuming that they

11   believed for a moment that the purge actually took place,

12   they knew it didn't take place as they represented.  And

13   when they realized that it had not taken place at all, they

14   made no effort to inform the Court or Positive Software.

15      They also suppressed evidence inconsistent with New

16   Century's fraud claim, evidence that actually completely

17   disproves the fraud claim.  And that will be the last part

18   of the presentation today.

19      So the first thing we're going to talk about is the

20   order or the duty to produce LoanForce in each and every

21   single version, including the version that John Norment

22   discovered on the Nitrogen server.  Their duty to produce

23   it comes from an order on a Motion to Compel Responses to

24   Request for Production.  And this is the request:  New

25   Century is requested to produce all documents that are

Linda J. Robbins, CSR, RDR, CRR

Page 6

1     relevant or refer to the programs.

2          The programs are listed as LoanForce, and not only

3     were they supposed to -- all versions, but they were also

4     requested to include any databases or database storage

5     schema modeling.  So if they had any database of programs

6     and versions of programs, they were specifically requested

7     to produce that.  They did not produce it.

8          Now, in the response, the original response to this

9     request for each and every version of LoanForce, including --

10    and the other programs, including databases that would

11    contain the programs or databases used to create the

12    programs, New Century agreed that it would produce

13    responsive information regarding LoanForce, LoanTrack,

14    LoanTrack-2, et cetera, including mLAS.

15         So not only was there an order from the arbitrator

16    compelling the production of this material, from the very

17    beginning they had agreed in writing to produce it.

18         The next slide is actually the order.  And Mr. Shurn

19    generally issued 30-, 40-page orders, but -- and this is in

20    your notebook, but the 16 items or the 16 programs at issue,

21    any objections regarding them are overruled--this is any

22    of their objections to discovery--LoanForce, LoanTrack,

23    LoanTrack-2, and mLAS.

24         So not only did they agree to produce every single

25    version of those programs and any databases that were used

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    to create them and contain them, they were ordered to do so

2    by the arbitrator.

3        Shortly after that order, I believe the day after

4    that order, Ms. Camina wrote a letter to the arbitrator

5    and says, to the extent they exist and have not previously

6    been produced, they would agree other versions of source

7    code for the 16 programs.

8        That's an agreement in writing, recognizing the duty

9    and obligation to produce each and every single version of

10   LoanForce, LoanTrack, mLAS, LoanTrack-2, as well as the

11   databases that they are stored in and used to create them.

12       She also in the same letter, "After the telephonic

13   hearing, I contacted Ralph Canada, counsel for Positive,

14   regarding production of other versions of source code for

15   the 16 items."  And she states, "New Century does not

16   maintain versions of the items."

17       So what she was telling Mr. Canada on the 13th of

18   November and the arbitrator on the 13th of November was

19   that no other versions of the programs existed that had

20   not already been produced on November 13th.

21       That representation never changed.  From that day

22   until the end of the arbitration, that representation

23   that no other versions existed never changed.

24       Now, in response, Mr. Canada wrote back to the

25   arbitrator, "Accordingly, Positive respectfully requests

1    that all documents that the NC Parties were ordered to

2    produce, including the source code for current and former

3    versions ... be produced no later than November 21 ... one

4    week from today."  And request -- and -- and "... Your Honor

5    made it clear that the source code that the NC parties were

6    to produce included the LoanForce database sql statements."

7        So, again, the arbitrator had ordered this be produced

8    on November 21st, Ms. Camina says nothing exists, there

9    are no older versions of LoanForce beyond what already

10   exists, and Mr. Canada responded reiterating, we still

11   expect everything that you have to be produced.

12       Now, again, in response to Canada's letter, Ophelia

13   Camina brings the arbitrator, the category involves other

14   versions of source code for the 16 items.  "As explained

15   in my letter of November 13, no other versions exist."

16       So, again, another representation which we know is not

17   true because they had a VSS database that contained every

18   version of LoanTrack, LoanTrack-2, mLAS, every single

19   version--and we'll see that later--and it was not produced.

20   We also know that the Norment version, the Norment version

21   of LoanForce discovered on the Nitrogen server was not

22   produced.

23       And I think the next step in this progression is to

24   talk about what happened on November 21st.

25       Now respondents contend in a brief recently filed

1    with the Court that New Century produced a full, hard copy

2    printout of the November 9 script to Positive on November 21,

3    2003, and they gave these Bates range numbers (indicating).

4    And supposedly they found it for the first time after this

5    weekend.

6        Well, Your Honor, I have here -- first of all, I want

7    to offer into evidence Exhibit 1 in response to this, and

8    Exhibit 1 is New Century's certificate of compliance with

9    their discovery obligations.  And we'll get to that.

10       Exhibit 2, 3, and 4 is the code that they produced on --

11   on disk.  And I think what you'll find if you get a chance

12   to peruse what they produced on disk, disk 1 or Exhibit 2

13   and Exhibit 3 contain no SQL code at all.  Exhibit 4

14   contains 35 SQL fields all from a version of mLAS and a

15   version of the RSDB database.  There is no LoanForce code

16   on any of the disks.

17       We had an agreement with New Century that code would be

18   produced in the form in which it's found which is machine

19   readable or -- or form that's on disk so that it could be

20   searched.

21       I cannot tell you exactly what happened on November

22   22nd when we got this other than the fact that our general

23   practice was to search the disk for things like sql or

24   LoanForce, and if it wasn't there, in this case it wasn't

25   there, that would have probably been the end of the -- of

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    the work.

2         And the reason why it was the end of the work is at

3    the time they produced these materials, they made a

4    representation to us that what they were producing was

5    the software as they were currently using it.  And they

6    made that representation again in Exhibit 1.

7         Let's go to the next slide.

8         So here we have Ms. Camina's cover letter for

9    November 21st, 2003.  It says, Also find enclosed herein

10   find documents and CDs Bates numbered, and here's the Bates

11   ranges that include the Bates range of the code that they

12   put in the brief to the Court.

13        Now, again, here are the documents that were produced

14   on the 21st (indicating).  There's no index to the

15   documents.  There's no list of contents.  There is simply

16   a giant pile of disorganized documents.

17        And I have gone in and I have put a yellow sheet at

18   the beginning and end of the Bates range numbers that they

19   reference in the brief.  And they are here for the Court to

20   see or I'll mark them for an exhibit if the Court wants them

21   marked.  But there is no cover sheet; there is no file name.

22   Suddenly in the middle of these documents, a bunch of SQL

23   tables start up.

24        Go ahead.

25        So there is no corresponding computer file in any of

1    the accompanying CDs; the code is not titled or identified

2    as Full LoanForce Database Script.sql; there's no indica-

3    tion of file size or file type, SQL or otherwise; and the

4    11/21/2003 production obviously included hundreds of pages

5    of other SQL code that has nothing to do with LoanForce.

6         Now, what did they tell us -- now, what did they tell

7    us later about what they had produced?  Now, Barry Barnett

8    filed with the arbitrator a description of what was produced

9    on November 21st.  And this -- this is consistent with what

10   they told us they were producing.  They had already told us

11   there are no versions of the programs older than what we've

12   already given you.

13        So on November 21st, signed by Barry Barnett, "New

14   Century produced the versions of the programs as New Century

15   was currently using them," and he gives the documents' Bates

16   range right here (indicating).

17        Within this Bates range of the versions of programs as

18   New Century is currently using them is the original version

19   of LoanForce or a version of LoanForce that dates back in

20   some parts to November 9th, 2000, a version of LoanForce

21   that had been enjoined, that they weren't supposed to be

22   using, that they weren't even supposed to have access to,

23   and Barry Barnett is telling us that that code, that enjoined

24   code that they were supposed to have no access to is the

25   version of the programs as New Century was currently using

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 12

1    them on November 21st, 2003.

2          So when they told us what they were producing was the

3    current version of the codes as they were using them, which

4    is what they told us at the time and what Barry Barnett

5    reiterated in January to the arbitrator, somehow we were

6    supposed to think they're still looking LoanForce so we need

7    to look through the paper -- it's not on the disk, but we

8    need to look through all this paper and see if maybe they're

9    still using LoanForce in violation of the Preliminary

10   Injunction because they only thing they told us they

11   produced was what they were currently using.

12         Now, if Barry Barnett was telling the truth when he

13   made this representation to the arbitrator, he is admitting

14   to contempt of the Preliminary Injunction.  He is admitting

15   to contempt of the Protective Order.  He is admitting that

16   they were continuing to use LoanForce on November 21, 2003

17   in violation of this Court's orders.  He certainly was

18   saying consistently with what he told us they were producing

19   on November 21st.

20         Next slide.

21         Where did the LoanForce SQL code printout delivered on

22   11/21/2003 come from?  We don't know.  Was it what they were

23   actually using?  Was it still on a software development

24   server somewhere?  Where did they get it?

25         If Barnett was telling the truth that what they

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 13

1    produced, the code they produced on November 21st was what

2    they were currently using, how was it currently being used?

3    In any event, it is clearly contempt.

4         Now, let's take a look then on the 21st at an e-mail

5    exchange between Ms. Camina and Mr. Chan.  Again, "New

6    Century has determined that it is impossible to provide

7    copies of the programs as they existed of October 31, 2001."

8    So, again, they're saying they can't get anything earlier,

9    they cannot produce any version earlier of any program,

10   including LoanForce, earlier than October 31st, 2001.

11        The next.

12        In response, Mr. Chan writes to Camina, we still want

13   you to inform us about where the earliest available date

14   for copies of the programs are.

15        In response to this, again we are told, there are no

16   earlier versions of the program; they don't exist.

17        Mr. Canada asked on December 12, the earliest versions

18   of the programs, including any application software.  Again,

19   we are reassured that nothing exists at New Century that

20   predates the programs as they had been produced in July,

21   which was the earliest dates that they had ever -- that

22   they had been produced in July of 2003.

23        So then we go on to December 12th -- I'm sorry, the

24   4/29 e-mail from Norment to Darkow and McCarthy.  And this

25   is important, I think, Your Honor, because one of the things

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 14

1    that they were constantly telling us after the Norment

2    analysis came to light and we filed a motion for contempt

3    that Norment had access to LoanForce, what they were telling

4    us and what they actually continued to tell us is that they

5    didn't know where this came from, they didn't even know

6    where Mr. Norment ever found it.

7         But here we have an e-mail from Mr. Norment on 4/29/03.

8    It says, "19 servers were imaged, all of which were Retail

9    IT servers.  All Retail IT servers were imaged.  Total-19."

10       Now, the servers imaged that were not included in the

11   original list of 11 were 8, and included in those 11 were

12   the Nitrogen server.

13        Next slide, please.

14        When Haynes & Boone produced us the hard drive, which

15   the Court has in evidence, we looked on the hard drive, and

16   right there on the hard drive on the Nitrogen server sits

17   LoanForce Client.

18        So we don't know where the unlabeled, no file

19   name printout that was buried in the production and

20   misrepresented to be something other than what it is

21   came from.  But we do know where John Norment's version

22   came from.  John Norment's version came from the Nitrogen

23   server.

24        Let's go to the next slide.

25        And here on 12/19/2003, Mr. Norment writes to Ms.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    Camina, "I have found a script that seems to be the creation

2    of the LoanForce database dated 11/9/2000.  The file is

3    called Full LoanForce Database Script ... and is 904 KB."

4          So on December 19th, Ms. Camina knows that the chief

5    technology officer of New Century Mortgage has found a copy

6    of enjoined software.  She knows now three things:  The

7    purge never took place.  She knows now that the Preliminary

8    Injunction has been violated.  Even if it's not an

9    intentional violation at this point, the New Century chief

10   technology officer has access to LoanForce code.  And he

11   also has access to material and information that has been

12   ordered--ordered--produced by the arbitrator and that she

13   has agreed to produce.

14         Next slide.

15         Now, the exchange with Norment goes on and notice that

16   Barry Barnett is also copied on this exchange.  In response

17   to Mr. Norment's discovery of LoanForce, Ms. Camina called

18   Udo Pooch on the phone and talked to Udo Pooch and told him

19   John Norment has found some software and he believes it's

20   the original version of LoanForce.

21         And Pooch responds, well, I've got this

22   Prospect_AnyLoan.sql version that we think is LoanForce.

23   So why don't you -- why don't you have Norment send it to

24   you and you can send it to me, and I'll compare the two

25   and see if this 11/26/2000 version of the Prospect table,

 1    is what that is, is the same as the 11/9/2000 version.

 2        Now, Ms. Camina at this point in time understood not

 3    only has it been ordered produced, not only have I agreed

 4    to produce it, not only am I under a duty now to inform the

 5    Court and my opponent that the Preliminary Injunction has

 6    been violated, not only am I under a duty to the Court and

 7    my opponent to let them know that the purge I represented

 8    never really took place, I've now discussed it with a

 9    testifying expert.

10        And a discussion of the document and the document's

11    contents, maybe they argue that's not the same as providing

12    it to the expert.  Maybe their argument is if you read the

13    expert a document, you haven't provided it to him because

14    you didn't send it to him, I don't think that's the law.

15    But, anyway, she clearly had a discussion with Udo Pooch.

16        Now, in her deposition -- let's go to the next slide.

17    "Q.   Exhibit 14 is an e-mail from you to John Norment, copy

18    to Barry Barnett.  And you're saying Pooch's file is called

19    Prospect_AnyLoan.SQL dated 11/26 and is 105 kilobytes.

20    "A.   Right.

21    "Q.   Pooch suggested you--meaning Norment --

22    "A.   Uh-huh.

23    "Q.   -- the person you're addressing this to, send your

24    file to me and then I can send it to him so he can compare

25    the files and tell us what the differences are.

Page 17

1    "A.    Right.

2    "Q.    How could Pooch not have been aware of the November 9

3    scripts but suggests that it be sent to him so he can

4    compare it to the November 26th Prospect table?

5    "A.    That's not what he's saying here.  What he's saying

6    is Pooch suggested you send your file to me, and then I

7    send it to him so he can compare the files and tell us

8    what the differences are.  What I told Dr. Pooch is we

9    found the file and we didn't know what it was.  It was

10   inconsistent with what he had told me.

11   "Q.    So you were discussing the Full LoanForce Database

12   Script.SQL file with Dr. Pooch?

13   "A.    I did not describe it in that way, no.

14   "Q.    I didn't ask you if you described it to him in that

15   way.  I asked you whether you discussed that file with the

16   Norment discovery with Dr. Pooch.  Did you discuss it or

17   not?

18   "A.    What I said to Dr. Pooch is, We found a file and we

19   don't know what it is.  And he suggests to me, Well, one

20   way to figure it out is for you to send it to me so I can

21   compare it against the other files that we have.

22   "Q.    Well, now, wait a minute, Ms. Camina.  If you didn't

23   tell him what you thought it was --

24   "A.    No.

25   "Q.    -- why would he be offering to compare it to the

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

 1    Prospect_AnyLoan.SQL file?

 2    "A.    That's not what he says.

 3    "Q.    Pooch suggested you send your file to me and then I

 4    can send it to him so he can compare the files --

 5    "A.    Uh-huh.

 6    "Q.    -- and tell us what the differences are.  Pooch's

 7    file is called Prospect_AnyLoan.SQL.

 8    "A.    Uh-huh.

 9    "Q.    So that's one of the files that's going to be

10    compared.  Right?

11    "A.    I -- I don't know that that's true, no."

12         Now, Your Honor, this goes back to the complete

13    lack of remorse and continuing cover-up of what happened.

14    Ms. Camina knew in her deposition that if she admitted that

15    she had provided Pooch this file or discussed this file

16    with him, that that was another basis for its discovery.

17         So she has to make the ridiculous argument that she

18    called Dr. Pooch and said, "We found a computer file," and

19    then he said, "Okay, send it to me and I'll compare it to

20    the Prospect table of a LoanForce Database Prospect table."

21    Of all the -- of all the code involved in this case, 16

22    programs, hundreds of subregistries, he just happened to

23    pick the one that you would need to use to compare to a

24    LoanForce script, and yet she actually says, "I didn't tell

25    him it was a LoanForce script.  I didn't discuss it with

1    him.   He just magically pulled that choice out of the air."

2         That goes again to the continuing arrogance and

3    cover-up of what's going on here.

4         Now, next, we now see why she was so hesitant to talk

5    about it in her deposition, because even at the time, John

6    Norment e-mails her back and says, "My only hesitation is

7    that now it must go to the other side.   Same with my Excel

8    spreadsheet."

9         This is the earlier part of the screen in the famous

10   yikes e-mail where she responds, what Excel spreadsheet,

11   and he talks about the Excel spreadsheet, the Norment

12   analysis where he compared the 2003 -- April 2003 version

13   of LoanForce to LoanTrack.   And that got discovered, and,

14   of course, then the whole issue of how did John Norment

15   get access to the April 2003 version of LoanForce and why

16   did he have it in violation of the Protective Order and in

17   violation of the Preliminary Injunction.

18        So there was something else that Norment had.   Norment

19   didn't only have the April 2003 LoanForce code in the

20   Norment analysis that caused the original uproar.   He also

21   had this November 9th version which you'll see that they

22   carefully covered up and blatantly misrepresented to the

23   Court Norment's activities.

24        So, in the alternative, Ms. Camina writes Norment back,

25   "Alternatively you can talk to Pooch ... and maybe figure

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 20

1   out what your file is.  Then we can decide if it helps and

2   want to make this file available to the other side."

3       This, again, goes straight to the core of who Ophelia

4   Camina is.  What we'll have you do is you can talk to Pooch,

5   you can tell him all about what's in this document, you can

6   describe the document to him, you can go over the document

7   with him, and we won't provide it to the other side unless

8   it helps.

9       And, again, what is this document?  It's a version of

10  LoanForce, code that she has in writing agreed to produce,

11  code that she has been ordered to produce, every single

12  version, code that at this point in time she doesn't

13  believe any version of this code has been produced, and

14  she's actually having a discussion with her client about

15  ways to get it to an expert without really getting it to

16  him or at least having no trail of getting it to him, we'll

17  talk to him about it, and then only if it helps will we

18  give it to the other side.

19      And, of course, it never was given to the other side

20  because it didn't help.  And we'll see that a little bit

21  later.

22      So, next--and this is important--the date here really

23  needs to be noted, December 22nd, 2003.  This is the day

24  before John Norment's deposition in California.

25      The day before his deposition he says, "I have found

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 21

1    a script that seems to be the creation of the LoanForce

2    database...."  Now, at this point in time Ophelia Camina

3    has no doubt that a chief technology officer of her client

4    believes that what he's found is the creation of the

5    LoanForce database.  "This file is called Full LoanForce

6    Database Script.sql."  It's pretty clear what this is.

7    And he's gone ahead and he's done an analysis of it.

8         Now, this analysis is not the Norment analysis that

9    was on the spreadsheet.  This is a separate analysis.  This

10   is a comparison of the 2000 version of LoanForce to the

11   2003 version of LoanForce.

12        And what we have here, he says, 1414 tables exist in

13   the April 2003 database.  549 columns in the table Prospect.

14   30 columns in Prospect do not appear exactly in the 2003

15   version.  So the 549 columns, only 30 of them do not appear

16   exactly in the 2003 version.  519 are exact copies.  All of

17   the other 93 tables are identical.

18        So he's telling her, what I have is identical in large

19   part to the 2003 version of LoanForce.  She knows at this

20   point this is all or part of LoanForce, this is a version

21   of LoanForce.

22        He also says the 2003 --

23             THE COURT:  If I can interrupt just for a second

24   just so we're all on the same page.  This is the description

25   of the database structure.  This is neither the application

U.S. District Court

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1    code nor the server code.

2              MR. SHORE:  Correct.  This is the core issue in

3    the case.  This is the SQL database scripts.  SQL database

4    scripts, the -- the -- the allegation of what was copied.

5              THE COURT:  I don't know because I haven't looked,

6    but normally you would expect that the SQL script describing

7    the database structure would be a very small percentage of

8    the aggregate application when you include both the server

9    and the client code.  Is that correct?

10             MR. SHORE:  Well, the -- talking about the

11   application code?

12             THE COURT:  Yeah.

13             MR. SHORE:  Yeah.  This is -- there is no

14   application code involved in this analysis at all.  None.

15   This is only -- in fact, the only thing that the lawsuit --

16   or the arbitration or the lawsuit involved was the copying

17   of database code, database SQL tables, columns, statements.

18             THE COURT:  Okay.

19             MR. SHORE:  So -- and then he's saying, "All of

20   the other 93 tables are identical.  The 2003 Prospect table

21   as 636 columns of which 519 existed in 2000."  So, in other

22   words, five out of six, the identity of these two programs,

23   the 2000 version of LoanForce that he found on a server, on

24   the Nitrogen server, and the 2003 version of LoanForce that

25   was the latest version of LoanForce that New Century claims

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 23

1   they used.

2        So then you go on, "If this is truly the November 2000

3   database, then significant (33%) changes were made...,"

4   meaning, 67 percent of it, two-thirds of it, is identical

5   which is reflective -- actually if you do the percentages

6   between identical tables and columns, it's more than

7   two-thirds identical.

8        So Ms. Camina gets this the day before John Norment's

9   deposition.

10       Now, also on December 23rd -- and the times on these

11   e-mails because of how Outlook works and also because one

12   was in Central time and the other is in Pacific time, so the

13   times -- all of these are in your notebook or are in the

14   evidence and they are actually shown to be in progression

15   in a string.  So we know which one came after which.

16       So, "Send it to me and we can have Pooch compare

17   against what he has from PSS."  And she asks, "Where did

18   you find this?"

19       Again, this is -- now we're on the day of his

20   deposition.  And it's sent from her Blackberry.  Apparently

21   she had just landed in California.  His deposition was in

22   California in the afternoon, and her Blackberry is still on

23   Dallas time.  This would have -- the actual time would have

24   been 12:25 p.m. Pacific time because his deposition started

25   at 1:00.  I mean, you'll see that here in a minute.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1      So, next, Norment e-mails her back, LoanForce in 2000,

2  is attached.  "It was found in a directory on a server we

3  had not previously reviewed."

4      Now, we know -- again, this is going to come back to

5  the purge.  We have the old e-mail where it says, we looked

6  at these 11 servers and then here's eight more that I don't

7  think anything is on but they're part of the Retail IT

8  LoanForce program.  One of those servers that was the eight

9  that supposedly they never looked at was the Nitrogen

10  server.  That's the server that he's referencing.

11      Next.  Hang on a second.

12      So right now what we have is we have Ophelia Camina,

13  the day before John Norment's deposition, gets an e-mail

14  from John Norment fully describing what he found on

15  December 19th, showing that it is identical in large part

16  to the November -- I mean, the April 2003 version of

17  LoanForce.

18      He then confirms it in two more e-mails to Ophelia

19  Camina when she lands in California to defend him in his

20  deposition.  In the deposition -- and, again, remember,

21  this is after the Norment analysis brouhaha had begun.  It

22  was important to us to find out, what does Norment have

23  access to?  What has he been using, the chief technology

24  officer?

25      So one of the things that we asked Norment with

1    Ophelia Camina sitting there is, do you have any access to

2    any part of LoanForce?  And this is the testimony he gave

3    with Ophelia Camina sitting next to him:

4    "Q.   Is there a copy of the LoanForce database software,

5    all or part, that you have access to today?

6         "Ms. Camina:  Other than on the images or the backup

7    tapes.

8         "Mr. Shore:  Yeah, other than on the images or the

9    backup tapes.

10   "A.   No.

11   "Q.   All right."

12        So their position was he only had access to the April

13   2003 version that was restored from backup tapes to help

14   them in the litigation; he didn't have access to anything

15   else.

16        She sat there when he was asked the question, Do you

17   have access to any version, all or part, of the LoanForce

18   database today?  And she interrupts and she says, Other

19   than what's on the backup tapes?  I said, Other than what's

20   on the backup tapes.  He answers, "No."  He commits perjury

21   with her sitting there knowing that she has on her Black-

22   berry and on her e-mail from the same day a description of

23   a LoanForce database he found on a server that had not been

24   previously reviewed, according to him.

25        Now, again, going to the next slide, this is what she

Linda J. Robbins, CSR, RDR, CRR

1    had to say about this.

2    "Q.    What is the date on Exhibit 16?

3    "A.    December 22nd.

4    "Q.    And who's it from?

5    "A.    John Norment.

6    "Q.    Who's it to?

7    "A.    Me.

8    "Q.    Now why don't you read into the record what John

9    Norment wrote you on December 22nd, the day before he

10   testified under oath in your presence that he had no

11   access to LoanForce database software, all or part.

12   Just read the e-mail into the record.

13   "A.    I have found a script that seems to be the creation

14   of the LoanForce database dated 11-9-2000, 7:33:38 p.m.

15   The file is called Full LoanForce Database Script.SQL and

16   is 904 kilobytes.

17       "Paragraph 1, it has 2153 columns and 96 tables.  It

18   has two, quote, duplicate tables called ProspectActivity

19   and ProspectOldPW which I removed from my analysis, so the

20   remainder has 1444 columns in 94 tables.  1a, MarketingSource

21   has 13 columns.  There are no tables called ActivityLog,

22   DailyBatch, DailyTrans.  2, Of these, 1414 Table_Column

23   exist in the April 2003 database.  DB -- I think database.

24   549 columns are in table Prospect.  30 columns in Prospect

25   do not appear exactly in the 2003 version.  All the other

1    93 tables are identical.

2         "Paragraph 3, In the 2003 version of the DB, there are

3    1826 columns in XX tables.  412 column did not exist in year

4    2000.  The 2003 Prospect table has 636 columns of which 519

5    existed in 2000.  There were at least 23 tables completely

6    added in the 2003 version, excluding temp tables.  Most

7    notably, ActivityLog, DailyBatch, DailyTrans.

8    MarketingSource exited in 2003 with 13 columns and in 2003

9    with 26 columns.

10        "Conclusion:  If this is truly the November 2000

11   database, then significant 33 percent changes were made

12   between 2000 and 2003.

13        "I would send numbers 1 and 1a above to Dr. Pooch so

14   that he can verify how close my schema is to the one he

15   has.

16   "Q.   All right.  Well, let's go back and let's look at

17   the deposition question --

18   "A.   Uh-huh.

19   "Q.   -- and the answer that he gave.

20   "A.   Uh-huh.

21   "Q.   Is there a copy of the LoanForce database software,

22   all or part, that you have access to today?

23        "And his answer:  No.

24   "A.   After it's limited, yes, that's correct.

25   "Q.   Yeah.  Other than on the images or backup tapes,

1    which this clearly was not.

2    "A.    Uh-huh.

3    "Q.    Yeah, other than on the images or backup tapes.

4         "Answer:  No.

5    "A.    Right."

6         So, again, that is in our view, why would she do this?

7    Right now we already had a motion for contempt on file.  We

8    were already litigating the fact that he had access to the

9    2003 version.  If it comes out that he also has access to

10   a version on a server that has not been looked at and it

11   happens to be a Retail IT server, that means there's no

12   purge.  That means that the Preliminary Injunction was

13   limited by them through fraudulent arguments.  That means

14   that the Preliminary Injunction is being violated because

15   he has access to LoanForce and they want -- they want the

16   access to continue because, as you're going to see, the

17   Nitrogen server he found it on was a development server for

18   software developers and a QA, quality assurance, server.

19        That is subornation of perjury.  And there's actually

20   a case closely analogous to this.  It's the Tedesco versus

21   Mishkin case.  An attorney suborned a witness's perjury by

22   allowing the witness to testify facts the attorney knew

23   were false and failed to correct the false testimony.

24        There is no doubt that Ophelia Camina knew on the 23rd

25   that John Norment had access to all or part of the LoanForce

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 29

1    2000 version of the database.  She allowed him to testify

2    denying access to exactly that.  She did it because she

3    didn't want an injunction expanded, she did not want

4    contempt, she did not want to face the Court in what she

5    knew would be collateral litigation over what they had done

6    before, it all would have come unravelled.  Their plans

7    would have come unravelled if Norment's access to this

8    version came to light.  So they suppressed it, they hid it,

9    and they allowed him to lie about it in his deposition

10       Here's the testimony:  "Is there a copy of the

11   LoanForce database software, all or part, that you have

12   access to today?

13       "Other than on the images or the backup tapes?

14       "Yeah.  Other than on the images or backup tapes."

15   The witness:  "No."

16       There could not be a clearer case of an attorney

17   allowing a witness to lie in a deposition, knowing that

18   he's lying and never correcting it to avoid contempt, to

19   avoid collateral litigation that would have unravelled

20   their entire scheme.

21       Next.

22       Again, the 11/2000 version in Norment's possession

23   would have demonstrated they stood in contempt of the

24   Preliminary Injunction, would have demonstrated the

25   purge as represented to the Court never occurred, and

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 30

1    demonstrated that the 4/03 version was two-thirds identical

2    to the version of LoanForce delivered to New Century.

3        And that's important because the tables described in

4    Norment's e-mail were the tables at issue in the litigation

5    that New Century was claiming its programmers wrote.

6        Now, I'm not sure she was aware of that at the time

7    because she'd only had a couple of days.  But if you go back

8    and look at the arbitration transcript, the tables Norment

9    describes in the e-mail as being identical are the tables

10    that were the core of the lawsuit where the arbitrator said

11    we couldn't prove who wrote them because we didn't have the

12    original as-delivered version to show him.

13        Go ahead.

14        So now what do we do with this?  We've got it.  So

15    Barry Barnett, Ken Gardner, Mark Anderson are all brought

16    into the loop.  She tells them on December 27, "John Norment

17    found the below on a server that had not previously been

18    searched."

19        Now, this is important.  Remember--and we'll get to

20    this in a little bit on the purge--Udo Pooch supposedly had

21    searched -- personally supervised the search of all Retail

22    IT servers.  There were only 19 of them.  And now they're

23    admitting that the Nitrogen server had never been searched,

24    a software development server for the Retail Division of

25    New Century Mortgage, a server that had also been used in

1    production.

2        So "This is probably something that needs to be

3    forwarded to Pooch...," which I think it was forwarded to

4    Pooch.  We can't find the actual e-mail because Pooch or

5    someone at Texas A&M destroyed all the e-mail records

6    between Pooch and A&M sometime in the last two years.

7        So to roll out the LoanForce database, "The date of

8    the below is about 2 weeks prior to the one received from

9    Shore Deary....  Someone needs to follow up on this piece

10    of evidence to look at it, and decide what to do with it."

11        There is no decision on what to do with it.  You've

12    been ordered to produce every version of it.  You've agreed

13    to produce every version of it.  You talked about it to

14    your expert.  Your client CTO has done an analysis of it

15    in violation of the Preliminary Injunction and in violation

16    of the Protective Order, and you're actually litigating

17    over a different analysis he did of the same type.

18        There is no decision.  There's no decision for an

19    honest, ethical lawyer.  There's no decision.  You turn it

20    over.  You turn it over immediately.

21        So then also on the 27th of December, Ophelia Camina

22    writes Barry Barnett, "Attached is a copy of the script ...

23    Norment found which contains (he believes) an 11/9/2000

24    version of the LoanForce Database.  This is detailed in

25    my prior e-mail forwarding John Norment's comments...."

1    In the prior e-mail in the string is Norment's analysis of

2    the -- of the code, a comparison of the 2000 code to the

3    2003 code.

4         So Barry Barnett also had Norment's analysis in the

5    same e-mail string as well as he's now being sent or

6    forwarded a copy of the code.

7         "I recommend we send to Pooch after someone verifies

8    this is what it is."  Well, again, I guess her argument is

9    on the 23rd it hadn't been verified it was a version of

10   LoanForce, although her client had told her that 93 tables

11   were identical to the -- to the April 2003 version of

12   LoanForce and 500 out of 600 columns were identical.  She

13   knew what this was.

14        Next.

15        Then Barnett says -- I mean, in response, Ken Gardner

16   says, "Aren't we going to invite a renewal of a motion to

17   compel us to look at all of the servers, not just the 19

18   that New Century Retail used?  Or did John find this ... on

19   one of the 19 servers?"

20        Well, he did find it on one of the 19 servers.  He

21   found it on the Nitrogen server.

22        And, again, "Aren't we going to invite a renewal of

23   a motion to compel...?"  Why would we want to produce

24   something that's going to have -- cause them to file a

25   motion against us?  Why would we want to produce something

Linda J. Robbins, CSR, RDR, CRR

Page 33

1    that might cause us a problem?

2         That is not how the law is supposed to be practiced.

3    You don't produce documents that you've been ordered to

4    produce, that you've agreed to produce, that you're under a

5    duty and obligation to produce, that you've talked to your

6    expert about, you don't decide to produce items like that

7    based upon whether or not it's going to cause a motion to

8    be filed.

9         Now, Mr. Barnett then says, "Let's discuss."  I don't

10   want to put anything else in writing, it's time to have an

11   oral discussion, this is a hot topic.

12        Now, Mr. Barnett claims that he doesn't remember this

13   discussion ever taking place.  At least he didn't remember

14   it taking -- and this, again, the "let's discuss," is on the

15   5th of January.  We're coming up closer to the arbitration

16   which I think started on the 21st.

17        So then--the next slide--of January 6, Anderson sends

18   Barnett, "Attached is the file Norment sent us and OFC

19   recommended ... we send to Pooch."  Either the discussion

20   has already taken place and he wants to see it, which I

21   think is a logical inference, or the discussion is about to

22   take place and he wants to see it to have the discussion.

23        The next e-mail.

24        After -- here's two e-mails with two different

25   attachments.  He had trouble opening an attachment so he

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    ended up having it sent to him twice in two different

2    formats.  "I guess this is what we ... have produced."

3    "Have we produced this?"  He's asking.

4        Now, I will represent to you, Your Honor, I have looked

5    hard, and I'm not -- I -- I can't say I've looked at every

6    single piece of paper, every single e-mail again.  But I've

7    looked at a lot of e-mails in this case produced by Susman

8    Godfrey.  I've looked at a lot of e-mails produced by New

9    Century.  This is the only piece of evidence in the entire

10    case that Barry Barnett wanted to discuss with someone about

11    whether to produce it, and it's the only one where he sent

12    two e-mails, or even one e-mail, saying, have we produced

13    this?  I guess this is what we produced.

14        This was a key, important piece of evidence, and they

15    all knew it.  It wasn't just a key and important piece of

16    evidence.  It was evidence of their misconduct.

17        Now, Mr. Barnett claims -- although there's e-mails

18    about wanting to have a discussion, there's e-mails about

19    multiple efforts to get him a copy he could open, there's

20    multiple e-mails where he's inquiring about whether or not

21    it's been produced, his position is now, I don't know who

22    made the decision not to produce it, I don't even know if

23    a decision was made, this just fell through the cracks.

24        That's not credible that the piece of evidence that

25    falls through the cracks is not the only one that the lead

 1   lawyer, a member of the Susman Godfrey executive committee,

 2   is inquiring about repeatedly.  That's not the piece of

 3   evidence that falls through the cracks.  But here is what

 4   Mr. Barnett has to say about this:

 5   "Q.   Who made the judgment not to produce the November 9,

 6   2000 version of LoanForce?

 7   "A.   As best I can tell, Mr. Shore, it fell through the

 8   cracks."

 9         And then Ms. Camina, sort of playing along the party

10   line, there's no explanation for it so the explanation is

11   there's no explanation.

12   "Q.   ... back to the November 9, 2000 version.  Who made

13   the decision not to produce that in the litigation?

14   "A.   I don't think that decision was ever made."

15         So they're discussing it, they're inquiring about it,

16   they're asking their paralegals has it been produced,

17   repeatedly, and yet nobody made a decision, nobody decided

18   to produce it, nobody decided not to produce it, this highly

19   important piece of evidence, this highly important document

20   is the one and only document they were all discussing and

21   talking about repeatedly during this period of time that

22   the contempt proceedings were going on, that fell through

23   the cracks.

24         Now, around this same time on the 30th, he is

25   corresponding with you, and he is corresponding with you

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1    about the Norment analysis.  And he says in one of those

2    letters on the 30th, "We take allegations of improper access

3    to confidential material seriously and will follow up to be

4    sure no one has had improper access to the material that is

5    subject of the Protective Order or the Court's injunction."

6        So he's telling you on the 30th, after he knows that

7    John Norment has access to a version of LoanForce that he

8    has seen described on December 29th in an e-mail, seen

9    described as a copy, a substantial two-thirds copy of the

10   2003 version of LoanForce, so the 2003 version, two-thirds

11   of it is copied from the November 2000 version, he's seen

12   that, he tells you that they're going to follow up to be

13   sure no one's had improper access to material subject to

14   the Court's injunction.

15       He didn't need to follow up.  He knew they had

16   material subject to the Court's injunction in the hands of

17   John Norment.  He never mentions to you or to us or to the

18   arbitrator a single time the existence of the November 9,

19   2000 version of LoanForce that John Norment has access to

20   after telling the Court that they're going to leave no

21   stone unturned to tell you all about John Norment's access.

22       And, again, in the letter of January 16th to the Court,

23   "I am writing to update the court on the results of the

24   investigation we have initiated into the circumstances

25   surrounding John Norment's access to and use of LoanForce

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 37

1    database materials for the purposes of assisting counsel

2    with the defense against claims in the pending arbitration."

3         Well, on December 16th, if you're going to tell the

4    Court about John Norment's access to LoanForce for the

5    purposes of assisting counsel, why would you not give the

6    Court information about his access to LoanForce found on

7    the Nitrogen server that he did a detailed comparison of and

8    sent the detailed comparison to counsel on December 29th?

9         Now, did he send that detailed comparison to counsel

10   for some purpose other than assisting counsel?  Was it a

11   hobby?  Is that how they're going to try to get out of this?

12   Was it something that Norment just -- well, maybe what it

13   is, it wasn't helpful.  So if it wasn't helpful to them,

14   it didn't assist them.  So maybe that's the argument.

15        Maybe the argument is, we didn't -- we can tell you

16   this, we can blatantly misrepresent to the Court the

17   circumstances of John Norment's access to the November 9,

18   2000 version of LoanForce and -- and not tell the Court

19   about his comparison of those two versions that he sent

20   to us in an e-mail because it didn't assist us, it hurt us.

21        I can't think of any other, you know, semantic reason

22   that would excuse this as a blatant misrepresentation to

23   the Court to cover up John Norment's access to the version

24   of LoanForce that he was enjoined from seeing.

25        And there is no dispute that John Norment was enjoined

1    from seeing the November 9, 2000 version of LoanForce on a

2    server.   There was no dispute that that was covered by the

3    injunction.

4        In the same letter, "Third, Mr. Norment's work on

5    the comparison of code appears to have evolved out of his

6    preparation of schemas represented by Dr. Stonebraker."

7    The November 9, 2000 comparison to the April 2003

8    comparison had nothing to do with Dr. Stonebraker.   Dr.

9    Stonebraker's name is not on it.   It was never forwarded

10   to Dr. Stonebraker.   Dr. Pooch's name is all over it,

11   talking about sending it to Dr. Pooch.

12       But this is -- again, they're trying to mislead the

13   Court into believing that Norment's only access to LoanForce

14   was from the restored backup tapes, the April 2003 version.

15   There is no other explanation for what they are trying to

16   convey to the Court, and what they are trying to convey is

17   false.

18       And, again, go back to that 22 e-mail--I found the

19   script, and all the description and comparison--this is

20   what Barry Barnett had in an e-mail string in e-mails to

21   him on the same day -- or actually on the 29th this e-mail

22   was forwarded to Barry Barnett.   He talked about it twice

23   with underlings, e-mailed underlings about it, was well

24   aware of it prior to the time he wrote the Court on

25   January 16th.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1       Let's go to a February 9th hearing where he is again

2   representing, "The second statement is Dr. Pooch's statement

3   in his amended declaration where he says, quote, no New

4   Century retain IT personnel"--that should be retail IT

5   personnel--"had access, close quote, to the LoanForce

6   database and that he personally, quote, supervised and

7   observed the deletion of these four databases--LoanForce,

8   LoanTrack, LFMoon, and LTKMoon."

9       So on February 9th, he's again coming to the Court and

10  reiterating to the Court in a hearing that he still believes

11  LoanForce was cleansed by Dr. Pooch from the New Century

12  servers.  This is after he knows that John Norment's done

13  an analysis of it, after he knows a version has been found

14  on a server, after he knows the cleansing is a -- is a

15  farce, he's still telling the Court that a cleansing took

16  place and that he has confidence in it.

17      Next.

18      We have more evidence on the intent.  On 12/3/2003,

19  we're talking -- there is a different subject, the Loan-

20  Track-2 transaction history and .mdf format, that Ophelia

21  Camina -- and, again, the To line is gone, but we know it's

22  Mark Malovos.  Who else was maybe copied on it, we don't

23  know.  But she says, "... just so you know, my view at

24  this point is that we should look for and produce what

25  they specifically identify as missing and we agree or we

Linda J. Robbins, CSR, RDR, CRR

Page 40

1    are ordered to produce."

2         So unless they know it exists and demand it and then

3    we're ordered to produce it or agree to it, discovery for

4    them is over.  We're not giving them anything else that's

5    not helpful to us.

6         That's not how you conduct discovery in federal court,

7    but it certainly indicates the intent on the part of Ophelia

8    Camina that discovery is now, as of December 3rd, a one-way

9    street.  The only thing the other side gets is what's

10   helpful to us.

11        And that's a follow-up to where she says, "We'll send

12   this code to Pooch, and if the comparison is helpful, we'll

13   send it to the other side."  It wasn't helpful, so we didn't

14   get it.

15        Now, did this make a difference?  And, again, all you

16   have to do is go to the award.

17        "Nor was the LoanForce Product as originally delivered

18   to New Century Mortgage offered into evidence at the Final

19   Hearing, and no comparison were made directly to the 'code'

20   of that original Product.  Additionally, the differences

21   between the original version and the version on Positive

22   Software's server in December 2002/January 2003 were not

23   identified at the Final Hearing.  Also not identified,

24   were the specific portions of LoanForce which came from

25   TeleTrend."

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 41

1        The earliest portion of the code that they gave us was

2   December 2002/January 2003.  They told us that even October

3   31st, 2001 wasn't available.  This was the -- and repeatedly

4   Ophelia Camina tells us, these are the earliest versions you

5   can get.

6        So we use the earliest versions in the trial, and the

7   arbitrator said that doesn't work because we don't know how

8   those versions changed from the earliest versions which you

9   did not have and did not put into evidence.

10       And let's again look at Barry Barnett's declaration in

11   the show cause proceeding:  "For reasons only it can answer,

12   PSS chose not to introduce its own copy of November 2000

13   software, which is listed as Exhibit R-651, into the ...

14   record."

15       Well, he didn't give you a copy of R-651.  He didn't

16   even describe R-651 other than to say it's the same as the

17   LoanForce -- original LoanForce database.  Well, now, you

18   know, we know R-651 is a single table, and it's a single

19   table that was prepared for a company called AnyLoan.  It

20   is very, very similar to that one table in the original

21   LoanForce database, we now know.  That is not a copy of the

22   LoanForce database.  It's a copy of a single table, the

23   Prospect table.  It's 104 kilobytes.  The original version

24   of LoanForce is 905 kilobytes, almost -- well, nine times --

25   almost nine times larger.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 42

1        Again, this is an effort to mislead.  Now, of course,

2   this was filed under seal believing that no one would ever

3   see it, it would never see the light of day.  When it was

4   unsealed and we read this, quite frankly, we were astonished

5   at the audacity.

6        And let's see -- take a look at what Barry Barnett had

7   to say about this in his deposition:

8   "Q.   So when you signed a declaration characterizing the

9   contents in Exhibit R-651 to a federal judge in a show

10  cause proceeding, you hadn't actually looked at it?

11  "A.   I had not looked at it in detail, that's right.

12  "Q.   And you hadn't had an expert look at it?

13  "A.   I don't know.

14  "Q.   And you didn't attach a copy for the judge to look at?

15  "A.   I did not at that time do that."

16       So, again, he characterizes it -- he doesn't

17  characterize it as a part of LoanForce, he doesn't

18  characterize it as something similar to LoanForce.  He

19  says that we had R-651 and it was a -- it was -- it was

20  the same as the November 9, 2000 version of LoanForce.

21       Just another instance of a lack of remorse and more

22  attempts to get out of the problem that they caused for

23  themselves.

24       So, in summary, on the November 9, 2000 version,

25  there's a duty to produce every version of that software,

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 43

 1   including the version to Norment discovered on a server,

 2   an active server.

 3        Susman Godfrey falsely claimed that no earlier versions

 4   of LoanForce existed when it was clearly on the Nitrogen

 5   server and John Norment clearly had a copy of it.  They

 6   not only misrepresented this to us, they misrepresented it

 7   to the arbitrator and they misrepresented it in Exhibit 1

 8   which -- again, Exhibits 1, 2, 3, and 4 is a compliance

 9   with discovery that they filed and the actual code.  And

10   we would offer those into evidence.

11             MR. BECK:  No objection.

12             THE COURT:  They're admitted.

13             MR. SHORE:  Camina allowed John Norment to commit

14   perjury when he denied having access to any version of

15   LoanForce, all or part or any part of it, other than the

16   April '03 version on backup tapes.  They compounded that

17   error by failing to correct the false testimony at any

18   time ever prior to the arbitration or after.

19        Respondents misrepresented Norment's access to

20   LoanForce in correspondence to the Court, repeatedly telling

21   the Court that his only access came from backup tapes that

22   he got from the Legal Department in June of 2003 and had

23   restored, specifically did not tell the Court that he had

24   access to a version on a server that he discovered on

25   December 19th, and they did it knowingly and intentionally.

U.S. District Court

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 44

1        As of 12/3/03, a conscious decision was made by Camina

2   not to produce any additional material in the litigation

3   unless it was first specifically identified as missing by

4   her opponent and they were ordered to produce it unless, of

5   course, it was helpful to their side.

6        When Barnett learned that Norment had discovered an

7   11/9/2000 version of LoanForce, his first reaction was to

8   ask his litigation team twice, have we produced this, is

9   this what we produced?

10       After Kenneth Gardner suggested that producing the

11  Norment version would cause collateral litigation and motion

12  practice because of their past inconsistent statements about

13  its existence and access and a violation, Barnett decided,

14  wait a minute, we need to talk about this.

15       During the contempt proceedings relating to the Norment

16  analysis, Susman Godfrey misled the Court by stating Norment

17  did not have access to any version of LoanForce other than

18  the April 2003 version despite his e-mails to Barnett and

19  Camina and Gardner and Anderson, all of them copied on it,

20  indicating that the 11/9 and 4/03 versions of LoanForce were

21  substantially identical, at least two-thirds identical.

22       Next?

23       Susman Godfrey's concealment of the 11/9/2000 version

24  that Norment had a material outcome on the case as did their

25  concealment of the 11/9 version when they produced it on

Page 45

1    12/21 -- on 11/21.  That is no excuse because, frankly,

2    they told us -- one, they told us what they were producing

3    was what they were currently using.  There was no reason

4    at the time not to believe that they -- that they produced

5    what they said they produced.

6         They also produced the code they produced on disk.

7    For some reason, unbeknownst and unknowable right now since

8    we just got it two days ago, they didn't produce the SQL

9    statements.

10        So the idea that suddenly that's a get-out-of-jail-free

11   card for their conduct I think misses the point, misses the

12   point of what they did, it's not credible, and it doesn't

13   excuse their conduct.

14        The next topic I'm going to talk about is the VSS

15   database.  There was a duty to produce any databases that

16   included any version of the 16 programs.  New Century used

17   Microsoft Visual SourceSafe, or VSS, a version-tracking

18   application that included the databases of all versions of

19   the software, including their logs.

20             THE COURT:  You're kind of shifting in your use

21   of the word "database" there, aren't you?

22             MR. SHORE:  Well, they were supposed to produce

23   all the 16 programs, including databases.  That -- that's

24   true.  The VSS would include more than just databases.  It

25   would also include application software.  And -- and what

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 46

1    I mean by database, I mean the database structure, the

2    database code, the SQL code.

3              THE COURT:   Okay.   I thought you were describing

4    the VSS itself as a database and saying --

5              MR. SHORE:   It is.

6              THE COURT:   -- when we asked for databases,

7    that should have included VSS because it's a database.

8              MR. SHORE:   Right.   And we'll go into the

9    discussion or the question, but we also asked for any

10   tools used to create the databases, including databases

11   that included versions of the databases under development.

12   And that's what the VSS is.   And this will be hopefully

13   clearer to you as we go through this.

14      A conscious decision was made to suppress the VSS

15   database despite New Century's willingness to produce it.

16   And that decision was made by Barnett and Camina.

17      So let's go back.   The "request includes each version

18   and any derivatives, database stored procedures and

19   database schemas modeling."   So in other words, the

20   database schema models would include VSS.

21      "Subject to these objections, New Century will produce

22   responsive information ... regarding" -- again, here's their

23   agreement.   They're going to produce anything related to

24   LoanForce, LoanTrack, LoanTrack-2, et cetera, including

25   mLAS.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 47

1        We then go to the motion to compel.  Again, they were

2   also, even though they agreed, subject to some objections,

3   they were ordered, and all those objections regarding those

4   programs were overruled.

5        So here we go to November 12.  And, again, this is

6   the whole time when the versions and what versions of this

7   software was available.  "Mark, Mark, and John"--that would

8   be Mark Malovos, Mark Anderson, and John Norment--"below is

9   my proposed letter to Peter Shurn describing what we were

10  ordered to do."

11       So, in other words--let's go to the next slide--they

12  were ordered to produce the VSS or ordered to produce all

13  versions of code.

14       Now, then we get news back from Norment to Camina,

15  "Regarding VSS and versions:  We supposedly have all the

16  versions of the programs in VSS."  So she is being told

17  on November 12th, we have every version of the programs.

18       "The other side will need the VSS product to read that

19  VSS archive file.  If they want it produced in another

20  manner, suggest that they can pay us to do it."  So, good

21  news, every version of the software is available, we can --

22  we can give it to them, every version, according to this

23  order from the arbitrator.

24       Next.

25       Then we have a letter from Camina to the arbitrator.

1    "After the telephonic hearing, I contacted Ralph Canada ...

2    regarding production of 'other versions of source code for

3    the 16 items.'  New Century does not maintain 'versions'

4    of the items."

5         This is in direct contrast to the great news she got

6    from her client the day before that they had every version

7    of every program, not LoanForce because LoanForce wasn't

8    something they created, but LoanTrack, LoanTrack-2, mLAS,

9    they had every version.  She's saying, we don't have any

10   earlier versions other than what we've already given you.

11        Then Norment tells Camina on December 10, "We have

12   supplied the following source code versions."  And here's

13   the versions of the source code they provided for

14   LoanTrack-1.  And as you see the last one -- you have

15   one for January of '03 for LoanTrack-1 and one or April

16   of '03, Development of LoanTrack-1 started in early --

17   late 2001, early 2002.

18        LoanTrack-2 source code has it again, all 2003.

19   LoanTrack-2 development started in 2002, including the

20   database development was in 2002.  Why would you not give

21   the earlier versions from 2002?  Because those are the

22   ones that were probably started out as direct copies of

23   the LoanForce database.  Those are the ones that -- that

24   showed the template from which you started.

25        mLAS went into production in 4/25/03, and they gave

Page 49

1    source code only as to April 9, 2003 and November 11th,

2    2003.  So they gave the only original -- the only version

3    of the source code for mLAS they gave was a version that

4    existed 16 days before they put it on line.

5        Again, there's no way you can track how the program

6    was developed and what the source of the code was if the

7    one you're getting is the one that starts out right two

8    weeks before they roll it out.

9        So then you -- go to the next slide.

10       "When we created the CDs" -- this is from John Norment

11   again to Ophelia Camina, and this is December 11, 2003:

12   "When we created the CDs, we used VSS to export all the

13   current"--all the current--"versions of the source for that

14   date.  I also sent Ophelia the VSS listing of the changes

15   that were made and recorded in the VSS log - but not every

16   version of the program."

17       So she knew on December 11th a couple of interesting

18   things, knew that -- that they had not done every version

19   of the program.  And we also know that Ophelia had been sent

20   a listing of the changes.  In VSS, a programmer can check

21   out a program, make changes to it, put it back into VSS,

22   and it will keep a log of who checked it out, exactly who

23   did the work and what the changes are from one version to

24   another.  That log was not produced.

25       "Within VSS, we actually have every {unaudited} version

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 50

1   of every program.  If we were to give someone the actual VSS

2   database, then they could use VSS to look at every version

3   and every change that was made."  That is what they did not

4   give us.  That is what would have been the road map to how

5   those infringing programs were created.

6        Let's go to the next slide.

7        Now, Mark Malovos, the in-house counsel for New

8   Century, understands what this means.  The source code road

9   map is available to the other side.  "Is that a good thing?

10  More than we are required to do or the same (just easier)?"

11       Well, obviously it was what they were required to do.

12  They were required to produce every version of the 16

13  programs they had, every document related to those programs

14  that they had.

15       So -- and, again, Ophelia -- go back one.

16       And Ophelia Camina is copied on this e-mail, "Is that

17  a good thing?"  Notice the date.  It's after December 3rd

18  when they have decided that we're not giving the other side

19  anything that they don't already know about, we're not

20  giving them anything unless they know about it, ask for

21  it, and are ordered to give it to us.

22       Next.

23       "If we gave them the entire VSS database - that would

24  be far and above what they requested (or even knew to

25  request)."  But--this is Norment to Malovos; Camina is

U.S. District Court

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1   not copied nor Barnett--"I would have no problem giving it

2   to them."

3        So the client is saying, I have no problem giving it

4   up.  And this is a nonlawyer that I guess hasn't read

5   the order from the arbitrator that all versions and all

6   documents related to all 16 programs were supposed to be

7   produced.  But he said, we can give them the entire VSS

8   database.

9        Next slide.

10        Now we have Malovos and Norment, "How long would it

11   take?  If it would be relatively quick, I would say go

12   ahead.  If not, let me check with Ophelia first."

13        So before we give the road map, they're going to

14   check with Ophelia.  Let's see what happens when they

15   explain to Ophelia that a road map to how all these

16   allegedly infringing programs were created is available.

17        So we have Norment again, "I now have the 'full' VSS

18   file for mLAS....  It would take another 2 days for someone

19   to produce the LoanTrack-2 full VSS.  Do you want it

20   produced?"

21        He responds, "I would ask Barry and Ophelia and defer

22   to them on this.  I can forward your e-mail if you would

23   prefer that it come from me."

24        So, again, it's fine with the client if we give up

25   the road map, but we were going to check with the lawyers

Page 52

1   first.  And this is December 29, 2003.

2        The next in the string?  There's an agenda that's sent

3   around for a teleconference or discussion between Barry

4   Barnett, Ophelia Camina, John Norment, and Mark Malovos.

5   One of the agenda item is, "We should have a complete VSS

6   archive file for LoanTrack-2 and mLAS.  This will have every

7   version of every file that was in VSS.  My understanding is

8   that we will burn a CD and FedEx to Ophelia to give to the

9   other side."  So they're -- this -- this is the agenda for

10  the conference -- the conference call.

11       And then the next e-mail, we have the outcome of the

12  conference call.  "Per our conference call on Monday"--the

13  29th; this is Tuesday, the 30th--"upon direction of counsel

14  this task is no longer necessary.  I have stopped working

15  on it."

16       So they have the conference with Ophelia and Barry,

17  they tell Ophelia and Barry, we can give them every version

18  of mLAS, every version of LoanTrack-2, we can restore it,

19  give them the VSS database.  But, you know what, it's after

20  December 3rd and we're not -- when Ophelia is not giving up

21  anything that we don't already know about unless it helps

22  us -- unless it helps them.

23       So after this conference call, the VSS database

24  disappears.

25       The next topic we have is mLAS.  And as you'll recall,

Linda J. Robbins, CSR, RDR, CRR

Page 53

1    Your Honor, when we were talking about the preliminary

2    injunction, it was a desperate, desperate attempt by New

3    Century to avoid the preliminary injunction touching upon

4    mLAS.

5        And to avoid the preliminary injunction touching upon

6    mLAS, the respondents repeatedly assured the Court that

7    mLAS was developed by programmers who never had any access

8    to LoanForce.  And the Court in a previous order said,

9    relying on those statements, the Court did not expand

10   the injunction to cover mLAS or LoanTrack-2 based upon

11   the statements from counsel that these were clean-room,

12   no-access projects.  Well, now we know that's not true.

13       Here's a 4/21 letter from Barnett to the Court:  "As

14   the Court will recall, mLAS was created by programmers who

15   had no access to LoanForce, LoanTrack-1, or LoanTrack-2

16   during the development process and who worked for a company,

17   eConduit Corporation, that was not acquired by New Century

18   until May of 2002."

19       Well, there's two false statements in that letter, in

20   that sentence.  One is they leave out the fact that mLAS

21   database was not created by eConduit.  It was created by a

22   company called VisionCore.  Specifically, it was created by

23   a programmer named Tony Dulkis at VisionCore.  And while

24   Tony Dulkis was still working on the mLAS database, he was

25   the database administrator for LoanForce.  And we'll see

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 54

1    that.

2         In their claim -- this is the statement of claim from --

3    from New Century, signed, entered by Susman Godfrey:

4         "PSS specifically claims that New Century reverse

5    engineered and copied LoanForce and incorporated or will

6    incorporate it in two different software products, LoanTrack

7    and mLAS.  New Century or one of its affiliates in fact

8    developed LoanTrack and mLAS independently of PSS and

9    LoanForce.  New Century nor any of its affiliates reverse

10   engineered or copied LoanForce software in whole or in

11   part."

12        Let's see the backup for that.  Again, the 4/22 letter

13   from Barnett to the Court:  "Regarding the new database in

14   mLAS, it was created independently ... and without reference

15   to LoanForce, LoanTrack-1, or LoanTrack-2; again, there is

16   no contrary proof."

17        Well, there was no contrary proof before the Court

18   because the contrary proof was in the possession of New

19   Century and its lawyers, and, of course, New Century and

20   its lawyers were misrepresenting.

21        And here's the e-mail from Monika McCarthy to Pat

22   Rank, the vice president, and Darkow.  This is -- notice

23   the date, 4/8/03.  This is after LoanForce -- the software

24   subscription agreement had been terminated, this is after

25   the software key had been turned off and demand for the

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 55

1   product had been asked for.

2        Ms. McCarthy says, "I also think our attorneys have

3   done a good job covering up the fact that we are continuing

4   to use their database.  But, the fact remains that we

5   continue to use their database in violation of their

6   agreement with them (which has been terminated), and

7   this is going to cost you."

8        Now, they, interestingly, on Tuesday filed a

9   declaration from Monika McCarthy saying that she didn't

10  mean what she said, that it was a bad choice of language.

11       Well, Ms. McCarthy is a lawyer.  Ms. McCarthy faces

12  disbarment for what she did and what she allowed her lawyers

13  to do.  And it's interesting that Ms. McCarthy didn't show

14  up ever to give a deposition, never subjected herself.  And,

15  as a matter of fact, in our negotiations in the bankruptcy,

16  she was still working as a consultant to New Century, she

17  insisted on being released.

18       So we'll go to the next slide.

19       Here is a call from Monika McCarthy, transcribed

20  voicemail that Ophelia Camina transcribed:  "Hey, Ophelia,

21  Monika calling....  Wanted to let you know that I'm sort of

22  up to speed with all the allegations with regard to mLAS.

23  We've basically decided on our side we're going to go ahead

24  with the implementation and use of mLAS at this point.  We

25  have a ... business need to do so and ... realize there is

Page 56

1   potential liability ..., but, you know, it is what it is

2   and we've gotta, you know, move forward.  So give me a call

3   on my cell," and we can discuss it.

4        So Ms. McCarthy, as you'll see later, knew that

5   LoanForce elements were in mLAS.  She knew it and she told

6   Ophelia Camina and Barry Barnett that.  Otherwise, there is

7   no explanation for the language in the e-mail about how we

8   understand there's a risk if we go forward with this, but

9   we've got to go forward.  We're producing billion of dollars

10  a month in loans and, you know, we're not going to put that

11  at risk, we're going to go ahead and violate preliminary

12  injunctions, violate copyrights because the money machine

13  is not going to stop.

14       Next.

15       Ophelia responds:  "I got your voice mail yesterday

16  regarding the decision to go ahead and deploy mLAS.  I

17  understand that you all have weighed the potential risks

18  versus the business needs in making this decision.  Thanks

19  for the update."

20       So, again, the business risk.  The business risk is

21  it's discovered that LoanForce is in mLAS and you get in

22  deeper trouble than you would have already been in.  And

23  we're going to see that in a minute.

24       So here's an e-mail from Norment to McCarthy, citing

25  basically all the defendants in the law -- the individual

1   defendants in the lawsuit, describing how LoanTrack and

2   LoanTrack-1 or -- or LoanForce elements ended up in

3   LoanTrack-2 and how the fields are the same and that

4   they can redesign it to cover it up.  They can redesign

5   LoanTrack-2 to cover it up, but that's going to take time.

6       So instead of redesigning it to cover up the LoanForce

7   code in LoanForce II, they recommend that they redesign it

8   for the next release.  Let's not even -- let's not even shut

9   it down for a week to redesign it because that would cost

10  us a week's worth of production.  We'll just wait until

11  LoanTrack-2, version 2, comes out and then we'll cover it

12  up, the fact that LoanForce is in LoanTrack-2.

13      Next.

14      And, again, Tony Dulkis works for VisionCore -- this is

15  an e-mail from Camina to Barnett and others:  "Tony works for

16  VisionCore and worked on mLAS.  While he worked on mLAS he

17  was provided table structures"--of LoanForce--"Tony Dulkis

18  got a printout of some table structures for LoanForce or

19  LoanTrack (he doesn't recall which)."  But LoanTrack was

20  also an enjoined program.  "Darius Lee sent this to eConduit

21  and he saw it.  Tony Dulkis used the Campaign Table and

22  copied some of the field names.  He did not copy the

23  database structure.  By copying the field names, this

24  necessarily means that you are also copying the type of

25  field"--et cetera--"He estimates that he copied about 3-4

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    of the Campaign fields."

2         And, again, this proves that the creator of the

3    mLAS database had access to, and did some copying, from

4    LoanForce, exactly what they told the Court did not and

5    could not have possibly happened.

6         Next slide.

7         This is an e-mail from Camina to Darkow and McCarthy:

8    "Dr. Pooch did a quick search for me of Tony's name in the

9    source code -- There are comments in the code that reflect

10   names of persons who work on code and the dates they did do

11   it.  Here's what Pooch tells me:

12        "mLAS:  Tony appears to be the principal author of

13   mLAS."  And, again, Tony works for VisionCore, not eConduit.

14   "His name is all over it.  Not surprising but troubling

15   given the below.

16        "LoanForce:  There are many references to Tony in

17   LoanForce, including in the LoanForce database.  A few are

18   in January of 2003," before they told the Court that no

19   one had any access to LoanForce who worked on mLAS.  "But

20   most are in March and April"--also before they told the

21   Court that no one had access to LoanForce who worked on

22   mLAS--"after the lawsuit was filed.  (Not a smart decision

23   in hindsight)."

24        So after the lawsuit was filed, an mLAS programmer has

25   his name all over and all through LoanForce.  Did they ever

1    correct their misstatements to the Court?  No.  They didn't

2    correct the misstatements to the Court because the e-mails

3    between Monika McCarthy and the voicemails between her

4    and Ophelia Camina indicate Camina knew this, knew that

5    LoanForce was in mLAS, but there was a business decision

6    to go ahead and do it.

7        Next.

8        This is, again, Monika McCarthy writing to Pat Rank,

9    and it's -- it's a July 7, '03 e-mail:  "... the fact that

10    some tables and fields were used from LoanForce in LoanTrak

11    1 & 2, and mLAS, not maliciously, but it did occur -- and

12    these transmission occurred and we will have to figure out

13    how to value this use."

14        So, in other words, again, a follow-up to what we

15    already know:  LoanForce was in mLAS, the lawyers knew it

16    was in mLAS, the client knew it was in mLAS, and they

17    misrepresented to the Court.

18        Next.

19        Here's an e-mail from Barry Barnett to Camina.  This

20    is all the way back in March of 2003.  It says, "The bottom

21    line is that New Century continues to use the LoanForce

22    database and has postponed switching over to mLAS and RESPA

23    (a new database) until the second or third week of May.

24    It also appears that the developers of LoanTrack copied

25    parts of the LoanForce database in creating the LoanTrack

Page 60

1  database."

2      Remember, this is the same Barry Barnett who wrote

3  you a letter saying that the people who created LoanTrack

4  had no access to LoanForce.

5      Next.

6      Here he is again later:  "Vision Core got the LoanForce

7  tables, and early on.  E-mails in fall of 02"--remember,

8  they only gave us versions of the software -- we talked

9  about this in the VSS portion.  They only gave us versions

10 of the software for '03.  Well, there's a reason why they

11 only gave us versions in '03, because e-mails indicate

12 that in the fall of '02, "... New Century is playing

13 games with the user-ids to evade increasing the number of

14 licenses...."--with--"References to LoanForce in the mLAS

15 code."

16     References to LoanForce in the mLAS code from their

17 expert.  We never got anything from Dr. Pooch, no notes,

18 no documents, no e-mails, no reports, anything that

19 indicated he had even done this.

20     Next.

21     Then there's a letter from Camina to Norment on

22 11/21/03.  Now, this is -- this is an interesting thing

23 because the client again is sending Camina documents to be

24 produced in the litigation, and Camina is looking at them

25 carefully, and there's a few documents she doesn't want

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 61

1    to produce or she wants to talk about them before they're

2    produced.  So she writes this letter to Norment to talk

3    about these documents.

4         Go ahead.

5         One of these documents is called LoanForce Support

6    Plan, and it's dated February 5th, 2003.  This is before

7    the termination of the license agreement and this is before

8    the litigation which was filed on actually February 6th --

9    I believe it was February 6th.

10        So here's VisionCore, Tony Dulkis and VisionCore,

11   talking about a LoanForce Support Plan where VisionCore

12   is going to have all access and basically take over--take

13   over--LoanForce, the entire operation of LoanForce while

14   they are still building mLAS.

15        This document was never produced in the litigation

16   obvious -- for obvious reasons.  It tells everybody that

17   everything they told you and us and the arbitrator about

18   mLAS being a clean-room approach, the mLAS database being

19   a clean-room approach, were false.

20        One of the things that was actually asked for, again,

21   was the VisionCore contract, including all exhibits.  This

22   was -- this was an issue because we took Tony Dulkis's

23   deposition and what he said in his deposition didn't seem

24   to jive with the contract -- the work that he was doing

25   didn't seem to fall within the purview of the contract with

Linda J. Robbins, CSR, RDR, CRR

Page 62

1    VisionCore that they gave us, which was a later contract.

2    So we wanted to know -- we wanted all parts of the contract.

3        So even after she has the discussion about are we going

4    to produce this, it has to do with LoanForce, it's clearly

5    called for, it's been ordered produced, they don't produce

6    it.  And even after we send them a letter saying, we want

7    all the VisionCore contract materials, they still don't

8    produce it.

9        Next.

10       And then there's an e-mail from Malovos:  "I glanced

11   through the documents you attached to your letter dated

12   11/21 in which you state that you want to discuss these

13   documents before producing them."

14       So -- and, again, they are having a discussion, a deep,

15   intense discussion about whether to produce this LoanForce

16   Support Plan indicating mLAS had access while they were

17   working on the mLAS database -- whether VisionCore had

18   access while they were working on the mLAS database.

19       And Camina to Malovos, "I want to go through them and

20   figure out their significance.  I suggest a quick phone

21   call when you get a chance."  This is part and parcel

22   to her produce-it-if-it-helps-suppress-it-if-it-doesn't

23   attitude towards discovery.  They have a discussion.  I'm

24   sure the discussion went something like, this pretty much

25   proves that Tony Dulkis and VisionCore had access to

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 63

1    LoanForce while they were working on the mLAS database,

2    this goes into file 13, which is where it went.

3         Next.

4         There's also another document of the six in the

5    letter, a LoanForce Problems document, also a document

6    never produced.

7         Next.

8         After VisionCore was hired, they had a list of problems

9    that they needed to address.  And this document actually is

10   also, I think, dated the 5th of February.  And one of the

11   things that VisionCore is going to do is review existing

12   source code and add comments as necessary.  The source

13   code they're reviewing is LoanForce database source code.

14        So, again, this is another document that proves that

15   while mLAS database was being worked on by VisionCore,

16   they had access to the LoanForce database.

17        Next.

18        And, again, here they talk about again the LoanForce

19   Support Plan, LoanForce Problem Docs, and there is more

20   discussions between Camina and Malovos about that.

21   Documents are ultimately not produced.

22        Now, this is the last thing I want to talk to you

23   about mLAS because I think it's -- and, again, this is

24   pretty important.  The Court clarified on the 16th the

25   Protective Order, saying, I can't find you in contempt

Page 64

1    because it wasn't clear enough, but let's make it clear

2    now.  LoanForce is confidential material.  Because it

3    was designated confidential material, it's confidential

4    material.  So now you know that information is

5    confidential, not just documents exchanged and discovered.

6    So we're going to clarify that.

7         So now New Century, Susman Godfrey, you now know that

8    if it's designated confidential, no one can see it except

9    those allowed to see it under the Protective Order.

10        This caused an uproar at New Century.

11        Next.

12        Monika McCarthy, when this clarification comes down,

13   is in a panic because she knows that LoanForce code is in

14   mLAS.  And she knows that if the Court has now decided that

15   LoanForce code is confidential, even if it was received

16   prior to the litigation, despite the fact that the use

17   of it violated the Preliminary Injunction, now we have

18   a Protective Order saying LoanForce code, as designated

19   confidential, cannot be seen by anybody other than people

20   allowed under the Protective Order.

21        So she, in a panic, e-mails Ophelia Camina and says,

22   "I would like a response from you as ... you have a better

23   understanding of the issues and testimony by our experts,

24   regarding New Century's continued use of Loan Trak 2 and

25   MLas, as a result of the judge's clarification," of the

Linda J. Robbins, CSR, RDR, CRR

1    Protective Order.  "As you know, this would be a drastic

2    measure that would have significant impact on the Company,

3    so it is not a step that I wish to take unless it is

4    absolutely necessary.  Also, what strategic steps can

5    we, or should we, take to ensure that we are doing the

6    right thing with regard to this latest clarification."

7         So she understands--and let's go to the next

8    one--because, remember, she's the one that says in an

9    earlier e-mail, "... some tables and fields were used from

10   LoanForce in LoanTrak 1 & 2, and MLas."  So she knows that

11   your clarification of the Protective Order would require

12   the shutdown of mLAS.

13        The response that comes from Camina and Barnett

14   apparently is, don't worry about that clarification,

15   we're not shutting anything down, business as usual.

16        The next topic I want to talk about is the purge or

17   the nonpurge.

18             THE COURT:  Just a matter of information, you're

19   right around 90 minutes.

20             MR. SHORE:  Okay.  I should make it with 15

21   minutes hopefully to spare for rebuttal.

22        So respondents misrepresented that New Century had

23   been purged of LoanForce to limit the scope of the Court's

24   Preliminary Injunction.

25        So what we have here in April of '03, there's an

Linda J. Robbins, CSR, RDR, CRR

1    e-mail from Barnett to Camina.   The bottom line is New

2    Century continued to use the database.   There appears to

3    be a serious problem "that may prompt Judge Godbey to

4    issue a preliminary injunction against further use of the

5    LoanForce database and of the LoanTrack database," and we

6    need to accelerate our changeover to mLAS and RESPA.

7         So it's clear from the very beginning -- and there's

8    notes that are in the record where that, from the very

9    earliest meetings, they admit to copying the -- the code

10   and misappropriating the code.   But very early on, they

11   are very concerned about preliminary injunction.

12        So Barnett on April 21st writes the Court a letter,

13   which is now famous or infamous, saying, "New Century will

14   no later than April 25 ... under Dr. Pooch's supervision,

15   delete or return ... all the LoanForce software, including

16   application ... and database, that New Century has the

17   ability to access."   We're going to take it all off

18   ourselves; you don't need to enjoin us.

19        Then, on 4/22, there's another letter from Barnett to

20   the Court, saying, "New Century responds, again, by assuring

21   the Court that New Century will delete from its servers all

22   database SQL scripts and codes, if any, that it believes

23   may be derived from LoanForce and are accessible to New

24   Century."

25        So he's reiterating, we're going to take care of this,

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

 1    we're going to take everything off.

 2         Then we have an April 24 declaration from Udo Pooch.

 3    He says, "On April 22, I also supervised and observed"--he

 4    personally observed--"the deletion of LoanForce, LoanTrack,

 5    LTK Moon and LF Moon."

 6         Now, we know that's not true.  It wasn't true on the

 7    24th when he wrote it and it certainly wasn't true on the

 8    22nd.

 9         So now we have the infamous lock-and-key declaration of

10    John Norment where John Norment says, everything has been

11    removed, we're not using it anymore, everything related to

12    LoanForce, the servers have been imaged and everything is

13    under lock and key in the Legal Department, and you don't

14    need to worry, Judge Godbey, about issuing a preliminary

15    injunction.

16         However, on the Nitrogen server in 2004 and on the

17    Nitrogen server on December 19th, 2003, John Norment finds

18    the LoanForce code.

19         Next.

20         In the interrogatory responses in the case, the

21    Nitrogen, Spider, Cheetah were called development/quality

22    assurance servers.  So if Dr. Pooch went to New Century and

23    personally supervised the deletion of LoanForce from all

24    of the servers, how could he have missed a development and

25    quality assurance server like Nitrogen, a server that was

Linda J. Robbins, CSR, RDR, CRR

Page 68

```
 1   being used to develop software?
 2        Now, on 8 -- August of '04, Barnett again tells the
 3   Court, "I believed, and continue to believe, that the
 4   deletion of LoanForce database versions as supervised by
 5   Dr. Pooch removed any danger of imminent harm to PSS."
 6   This is in his show cause declaration.
 7        Now, this is after he knows that LoanForce has been
 8   found on a development/quality assurance server, this is
 9   after he knows that John Norment found a version subject
10   to the injunction, and we'll show you in a minute what else
11   he knew about Pooch's so-called purge.
12        Next file.
13        So what exactly did -- did Pooch do?  Well, on 4/22nd,
14   he spent a grand total of five hours at New Century.  And
15   he met with people from VisionCore during that time, he met
16   with people from eConduit, he met with people from New
17   Century.
18        So this is his only bill related to any design of a
19   purge, any implementation of a purge, and this is also, by
20   the way, shortly before he prepared his -- his summary, his
21   declaration for the preliminary injunction hearing.  So all
22   the information he would have had to have gotten to create
23   his expert report for the preliminary injunction, he had to
24   do that in the same five hours.
25        So then let's look forward at who really did the purge.
```

1    Here is Barry Barnett copied on the e-mail from John Norment,

2    April 18, 2003, and John Norment talks about all the steps

3    being taken to change -- to -- to purge and prepare for the

4    removal of LoanForce.  Who's doing it?

5        On April 18th, "Load data into mLAS using scripts.  An

6    external expert, Dr. Pooch, will be on-site Tuesday ... and

7    will review all of the above ... and supervise the final

8    load of data...."

9        So Dr. Pooch didn't do any of these things.  He came

10   back and reviewed what they did.  And the only thing he

11   actually did was supervise the load of data.  He didn't

12   purge anything.

13       And there's another e-mail that shows he didn't purge

14   anything.  Here's an e-mail from Norment to McCarthy:  "We

15   expect Dr. Pooch to arrive Tuesday to supervise the mLAS

16   load data (sic)."

17       And then the other technical issues, "The servers

18   containing the sql databases will be 'cleaned' beginning

19   today," not under Dr. Pooch's direct supervision.  Dr. Pooch

20   didn't identify the servers.  Dr. Pooch did not observe

21   their deletion.  "Corporate IT will remove any traces of a

22   LoanForce-LoanTrack (sic) code."

23       So who was it -- when they came and told you, we had

24   this outside expert come, identify the servers that had the

25   code, and personally observe the deletion, who really did

1    it?   Corporate IT at New Century.

2         Would the Court have trusted a representation different

3    than what they gave, that simply all they did was have Dr.

4    Pooch go and load data from -- from -- into mLAS, that the

5    real people who did this supposed purge wasn't an outside

6    expert but was the corporate IT department?

7         Let's go to the next.

8         Now, this is 4/29.  Now, remember, 4/29 -- all this

9    purging was supposed to have occurred on 4/22, April 22nd,

10   a week before.  "19 servers were imaged, all of which were

11   Retail IT servers.  All Retail IT servers were imaged.

12   Total - 19."  "The servers imaged that were not included

13   in the original list of 11 in my declaration were 8."

14        What's on those eight?  Jaguar and Nitrogen.  So even

15   if there had been a purge on the 22nd or the 21st, the

16   purge was of the 11 original servers.  These extra eight

17   (indicating) were never looked at, never reviewed, and they

18   certainly were never purged.  And we know that from this

19   e-mail from a week later.

20        Now, let's look at a diagram of the servers produced

21   in the litigation.  Here's Nitrogen (indicating).  Here's

22   Jaguar (indicating).  Now, remember, they told us in

23   discovery responses that Nitrogen was a development

24   server and a quality assurance server.  And they told you

25   repeatedly all of the retail production servers, the stuff

Page 71

1    actually used in the production of loans, everything has

2    been erased from that.  Actually they told you everything

3    had been erased from everything.

4         Where's Nitrogen?  Nitrogen is listed as a production

5    server.  So when John Norment found code in December of

6    2003, he found it on a production server.

7         Next.

8         And, again, another document produced during the

9    litigation, you had Jaguar and Nitrogen, production

10   database, production backup database, and a standby for

11   Jaguar.  These were listed in the documents as production

12   databases.  They were listed in interrogatory responses

13   as development or quality assurance databases.

14        And even today, in 2006:  "I wanted to bring ... your

15   attention that I noticed today - I found some old LoanForce

16   files ... on a shared drive."  When was the shared drive?

17   It was on a Retail IT server in 2006.

18        There was no purge.  Corporate IT went and took it

19   off a few things, a few servers, left it on the critical

20   servers.  Dr. Pooch came in, nodded his head, checked it

21   off because that's what he was paid to do.

22        The next topic I want to talk about quickly is -- is

23   Dr. Pooch in general.  First of all, there's a duty to

24   produce expert materials, and New Century withheld multiple

25   expert materials from Pooch.  And -- and this -- this list

Linda J. Robbins, CSR, RDR, CRR

Page 72

1    here of these four is not all of them.  These are the ones

2    that we found documented, but I believe there is certainly

3    more.  And Barnett and Camina were certainly complicit.

4          Here is an e-mail from Kim Gardner to Barnett and

5    Camina:  "Shore's original order on PSS's motion to

6    compel ... required us to produce all communications"--

7    communications--"to and from Pooch, but not any other

8    expert."

9          Well, they weren't required just to produce documents

10   they gave him.  They were required to produce any

11   communications that took any tangible form, which would

12   have certainly included voicemail.

13         Pooch did a draft report.  The draft report was sent

14   to Ophelia Camina.  Ophelia Camina took the draft report,

15   forwarded it to Barry Barnett.  Barry Barnett made comments

16   to the draft report and returned it to Ophelia Camina.

17   Ophelia Camina then presumably sent it to Dr. Pooch because

18   all of the comments that Mr. Barnett made to Pooch's report

19   ended up in Pooch's report.

20         We never got the draft report.

21         Let's go to the next slide.

22   "Q.   The draft that you commented on, shouldn't that have

23   been disclosed in the litigation?

24   "A.   Probably, yeah.

25   "Q.   Do you know why it was not disclosed?

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 73

1    "A.    I do not.

2    "Q.    Who made the decision not to disclose it?

3    "A.    I do not know.   It was my responsibility, but I

4    don't know who made that decision."

5         All right.   And then again here are a few of the

6    comments to the Pooch draft report that Barnett made and

7    sent back to Camina knowing that it had to be produced,

8    which of course it wasn't.

9         Also--this is important--Pooch did a comparison of

10   the mLAS DataWarehouse database to LoanForce and he found

11   tables and he highlighted portions of them that he found

12   similar to LoanForce.   This is their expert witness finding

13   tables in mLAS that looked like LoanForce tables.   He

14   prints them out, he highlights them, and he forwards them

15   to Ophelia Camina.

16        Ophelia then forwards them to the client in an e-mail,

17   but she certainly doesn't forward them to opposing counsel.

18   Opposing counsel doesn't get to cross-examine Pooch on his

19   highlighted similarities between mLAS and LoanForce which

20   Pooch then goes to the arbitration hearing and says there

21   are no similarities and he found none.

22        Next file.

23   "Q.    But we never received in litigation highlighted

24   tables from mLAS as part of the Dr. Pooch or any other

25   piece of discovery.   So is that just something that,

Page 74

1   again, an honest mistake, didn't get produced?

2   "A.   Yes."

3      The honest mistakes always seem to be honest mistakes

4   that deprive us of critical evidence and they all seem to

5   be honest mistakes consistent with the December 3rd e-mail

6   not to produce anything unless it's specifically asked for,

7   known about, and helpful to them.

8      Next.

9   "Q.   Well, if it wasn't removed -- put it this way.  It's

10  probably still in the Redweld; it was just never produced.

11  Right?

12  "A.   I don't -- I don't know how to answer that.  Probably

13  somewhere -- I don't know.  I don't know what the situation

14  is."

15     That's the defense to not producing anything.  Nobody

16  made the decision.  Nobody knows.  It's just -- gosh, it

17  just fell through the cracks, all the evidence that would

18  have helped -- been helpful to you, all the evidence that

19  would have helped prove your case, gosh, that's the evidence

20  that fell through the cracks.

21     We then go to the transcript of Udo Pooch's e-mail.

22  This is where Udo Pooch wants to take a look at some things

23  to see if he can compare them and help them out.  But if he

24  looks at them and he does a comparison, he wants to make

25  sure that there's no trace of the source because the source

1  would be versions of the software that they haven't produced

2  that are earlier than the versions they have.

3      So we have here is he -- you know, they're trying to

4  find out how -- how do we have you do this work without the

5  other side figuring out that we're withholding this stuff?

6      So Pooch has a great idea and calls Ophelia and he

7  says, "Ophelia, this is Udo ... I was just thinking about

8  the backups that they have," they being New Century, the

9  historical backups that they were not restoring and

10  producing to us.  "If you folks really want to do something

11  with that in terms of ... damage control, my suggestion is

12  to go and take each of the backups that they have, extract

13  from that backup the LoanForce and LoanTrack TIM tables

14  that were specified by the other side's expert"--that's in

15  J. Etchison's report--"copy those tables and store them into

16  a separate file and put the date on it, ok, so just store

17  them as miscellaneous or whatever you want to call them and

18  then just date them and do that for every historical backup

19  tape that they have and then once they've done that, copy

20  all that stuff or move all that stuff onto a CD and ship me

21  the CD and I'll analyze it.  But that's what needs to be

22  done."

23      So if you want to make sure that the source of what

24  you send me is not ever known to the other side, instead of

25  just restoring the backup tapes, putting them on a disk and

Linda J. Robbins, CSR, RDR, CRR

1    sending them to me, which would show exactly where they came

2    from, when they were dated, what version it is, here's what

3    you do:  Let's just do a little laundering.  Let's just --

4    let's just completely hide and erase the ability to trace

5    this.

6          That e-mail -- that voicemail transcribed shows that

7    Dr. Pooch was actively engaged with the lawyers in fraud.

8    It shows that he was actively engaged in damage control and

9    hiding information from the opponent.  That is the kind of

10   voicemail transcript that anyone would want to have to

11   literally destroy the credibility of an opposing expert.

12         Let's go to the next slide.

13         And, again, they knew they had a problem with

14   Dr. Pooch.  "We do have a problem with the experts.

15   Apparently there are some e-mails -- hopefully a very

16   small number -- that we haven't yet produced, but need

17   to produce.  The 'schema analysis' that Dr. Pooch reviewed

18   ... wasn't produced as far as I know.  I don't know the

19   reason, but we are now fully aware of the problem and I

20   do know that we are now trying to gather these e-mails

21   to produce to the other side."

22         Again, they were aware of all these issues with Pooch.

23         Next.

24         This is all the way to just shortly before the

25   arbitration, "We still have the problem that we haven't

U.S. District Court

 1    produced Udo's e-mails (including this one, including the

 2    attachment)."  From the date I think, although I can't say

 3    for sure, that this is the e-mail transferring his draft

 4    report which we never got because we never got the draft

 5    report.

 6         Next.

 7         And, again, Pooch's comparison of LoanForce to

 8    TeleTrend, this is all the way -- this is a week -- well,

 9    ten days before the arbitration.  "Has Pooch made any

10    progress on comparing the TeleTrend database with the

11    early November 2000 LoanForce database and the April '03

12    LoanForce database?"

13         Now, remember, the comparison -- the original

14    comparison we know about of the November 2000 LoanForce

15    database with the April '03 LoanForce database is one

16    John Norment made that they were saying, let's send this

17    to Pooch and have him make it, too.

18         I think this 11/2000 LoanForce database they're talking

19    about is the November 9, 2000 database that John Norment did

20    a -- found and did a comparison on, and Ophelia Camina in

21    four different e-mails said, let's send this to Pooch.

22         Now, they deny doing it.  They say, we didn't send it

23    to Pooch.  But this indicates that Pooch was being asked

24    to do the same analysis that Norment did to see if his

25    conclusions were the same.

 1      "Has Pooch made any progress on figuring out when the

 2   allegedly infringing fields were added?"   "Pooch's last

 3   report to me ... he was working on it but he should be

 4   done by now."   Again, we never received anything about

 5   Pooch receiving the November 9, 2000 version or comparison

 6   of that version to TeleTrend or to the April 2003 version.

 7        Next.

 8        Now this is what --

 9   "Q.   And other than Exhibits 1 through 4, have you set

10   forth in writing at any time any of the opinions that you

11   may have related to this case?

12   "A.   No."

13        So here's Dr. Pooch saying, other than Exhibits 1

14   through 4 -- and Exhibits 1 through 4--next slide--were

15   his is declarations and his expert report on November 7.

16   So Dr. Pooch basically denies there's a draft expert

17   report, denies that he's done any other work on TeleTrend

18   comparisons, denies information that we know exists -- we

19   know at least the draft expert report exists.   And when

20   Dr. Pooch gives that testimony that there's no other thing

21   in writing that he's ever expressed his opinions on, who

22   is sitting next to him?   Three guesses, and I think you

23   only need one:   Ophelia Camina.

24        The last thing I want to talk to you about, Your Honor,

25   very briefly is something called the Lemieux alternatives.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 79

1          They filed a fraud case against Positive Software.

2     Now, I asked in the depositions, and you've seen the

3     depositions, who came up with the fraud case, whose idea

4     was that, who did the Rule 11 investigation?  No one will

5     admit to being the source of the fraud claim.

6          Now, there's a reason for that.  The fraud claim was

7     fraudulent.  The Lemieux alternatives--next slide--the

8     Lemieux alternatives are dated 1/31/03 before the cut-off of

9     LoanForce, the goal "not to ... cease using ... LoanForce

10    application unless absolutely necessary such as in the

11    events:  PSS does not renew by choice...."

12         It's clear that they were -- they knew on January 31st

13    that PSS may not renew and could cut off the software key.

14    And so they had two different alternative plans, a two-day

15    plan or a five-day plan.  The two-day plan was if it was a

16    sudden cut-off, and a five-day plan was if they had more

17    time.

18         So ultimately they actually implemented the two-day

19    plan because they were only down for two days after the

20    software key was cut off.

21         So on January 31st, '03, Jeff Lemieux is planning for

22    the cut-off of LoanForce and has a two-day solution, which

23    ultimately, we now know, the two-day solution is the one

24    that they implemented.

25         Next.

1        However, in the arbitration, being questioned I

2   believe by Ophelia Camina, "What was your reaction when you

3   learned that LoanForce stopped working on February 6th?

4        "Shocked."

5        He wasn't shocked.  A plan was in place.  A two-day

6   plan to fix it was in place.  This is the source of their

7   fraud claim.  We had no reason to believe that this thing

8   was going to be turned off, we were caught completely by

9   surprise, when in fact they actually had a plan, a written

10  plan in place for exactly such event.

11       I'd like to reserve my last 15 minutes for rebuttal,

12  but, Your Honor, I think that this is an overwhelming case

13  of -- it's beyond normal misconduct, it's beyond fraud.

14  It is a case of attorneys who put the interests of their

15  client and their own personal interests above the truth.

16            THE COURT:  All right.  Your last 15 minutes are

17  only 10 minutes long.

18            MR. SHORE:  Okay.

19            THE COURT:  Let's go ahead and take about a

20  10-minute break now.  I show 10:23.  So we'll see you back

21  at 10:33.

22       (Brief recess taken.)

23            THE COURT:  Be seated.  Mr. Beck.

24            MR. BECK:  May it please the Court, Your Honor,

25  with the Court's permission, what I'd like to do is to deal

Linda J. Robbins, CSR, RDR, CRR

Page 81

1    with the show cause issues first and then my colleague,

2    Mr. Fogler, will deal with the motion for sanctions, if

3    that's agreeable with the Court.

4              THE COURT:  Sure.

5              MR. BECK:  And we will not use the fully allotted

6    hours.  All these issues we think that have been raised this

7    morning have enjoined in our papers, and there's no sense

8    in us going back over exactly what we've said in our papers.

9    But there are a few things that I'd like to call to the

10   Court's attention with respect to the show cause.

11        In April of 2003, before entry of a Preliminary

12   Injunction, Mr. Barnett represented to this Court that New

13   Century had deleted all of the LoanForce software from its

14   active servers.  I don't think there's any question about

15   that.  And as I read the record based on that, it appeared

16   that the Court narrowed the scope of the injunction.

17        So we clearly have a situation where there was a

18   representation to the Court, and apparently the Court

19   acted on that representation.

20        I think the evidence is pretty clear that subsequently,

21   during discovery in the arbitration, New Century restored

22   the LoanForce software on some of its active servers.  And

23   I think it's undisputed that Mr. Barnett failed to advise

24   the Court that that had been done.  Again, I think that's

25   what the record clearly shows.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1          Another issue which I -- in reading the record, it

2     appears that the Court was concerned about was the fact

3     that a Protective Order was entered by the Court and, as

4     the Court knows, there was an identical Protective Order

5     entered by the arbitrator which really limited access to

6     information designated as confidential to New Century's

7     outside counsel and its inside counsel.  It actually was

8     a two-way street.  The same thing applied to Positive in

9     this case.

10         The evidence shows that one New Century employee, John

11    Norment, used New Century's copies of LoanForce software to

12    perform an analysis for litigation purposes.  And I know

13    the Court was concerned about whether there was a violation

14    of this Court's Protective Order.

15         And then the third area, it appeared in looking at the

16    record, was this whole issue of the November 2000 script,

17    which you've already heard about it.

18              THE COURT:  And you can skip number 2.

19              MR. BECK:  All right.  With respect to the

20    restoration of the LoanForce software, the evidence before

21    Your Honor, I would respectfully submit, shows that New

22    Century determined that it no longer was going to use

23    LoanForce or LoanTrack-1 software.  It had almost completed

24    the development of LoanTrack-2 and really didn't think it

25    was necessary to use either LoanForce or LoanTrack-1.

Page 83

1         So what happened was, according to the evidence, is

2    New Century decided to delete all LoanForce and LoanTrack-1

3    database software from its active servers as well as its

4    earlier disabled application software from its desktops.

5    It engaged, as the Court knows, Dr. Udo Pooch, a respected

6    computer expert from Texas A&M, to really supervise this

7    effort.

8         The deleted software was preserved for litigation

9    purposes.  We didn't want to claim that somehow we had

10   destroyed evidence, and its access was restricted to, or

11   at least was supposed to be restricted, to New Century's

12   Legal department.

13        Now, our clients, under the evidence we believe it

14   shows, relied on Dr. Pooch and, frankly, our client to

15   accomplish this deletion and preservation.

16             THE COURT:  When you say your client, you mean --

17             MR. BECK:  New Century.

18             THE COURT:  Okay.

19             MR. BECK:  In other words, that our clients Mr.

20   Barnett and Ms. Camina relied on Dr. Pooch and New Century

21   to accomplish this deletion and preservation process.  And,

22   understandably, they were assured that the process had been

23   successfully completed.

24        And so when Mr. Barnett wrote the Court in April of

25   2003 about the deletion, understandably, I would submit, he

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 84

1    believed his statements certainly at the time were true.

2         Now, when he wrote the Court saying that LoanForce

3    software had been deleted, he frankly did not consider

4    at the time that backup tapes might have to be restored

5    in order to respond to forthcoming, or what would be

6    anticipated to be forthcoming, discovery responses from

7    Positive in the case.

8         In hindsight maybe he should have anticipated that.

9    Maybe he should have told the Court that.  The record is

10   clear he did not do so.

11        In the arbitration, Positive requested all information

12   from New Century backup tapes.  We objected to that.  And

13   when I say we objected, I'm talking about our clients

14   objected to that.

15        After objection, Positive limited its request for

16   restoration of the backup tapes to three dates:  October 31,

17   2001; January 21, 2003; and, quote, as currently being

18   used.  There is some issue in this case as to whether the

19   November 9, 2000 script version was ever requested, but

20   that's really kind of a side issue, if you will.

21        The important point from our perspective, and what

22   we believe the record conclusively shows, is that the

23   arbitrator and counsel for Positive were told that the

24   restoration was going to be done by New Century employees

25   and it was going to be done on New Century computers.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 85

1        New Century restricted access to those computers.  No

2    one, neither Positive nor the arbitrator, objected to this

3    process.

4        And because the arbitrator was really supervising all

5    the discovery in the case, our clients--Mr. Barnett and Ms.

6    Camina--did not really think it was necessary to advise the

7    Court that it was responding to the discovery request in

8    the way it was.  In other words, that LoanForce software

9    had been restored and were on New Century computers.

10       That was a mistake.  They should have done so.  It's --

11   it's -- it's the Court's order that's the most important

12   thing.  They should have gone back.  Notwithstanding the

13   fact that the arbitrator was supervising all of this

14   discovery and they knew what was taking place and the

15   arbitrator knew was taking place, because a court order

16   was involved, our client should have gone back and advised

17   the Court, if for no other reason than let the Court know

18   what was happening and the Court could then say, well, no,

19   you can't do that, or, yes, you can.  But they didn't do

20   that and that was a mistake.

21       But respondents, from their vantage point, were assured

22   by New Century that no one at New Century commercially used

23   LoanForce or LoanTrack-1 software after April 2003.  We --

24   our clients believed them and we've seen no evidence to the

25   contrary before Your Honor.

Linda J. Robbins, CSR, RDR, CRR

Page 86

1        Now, let me talk about New Century employee access to

2    LoanForce software.  And this really gets into this issue

3    of whether or not our clients in good faith did or didn't

4    do anything.

5            THE COURT:  And this time our clients means --

6            MR. BECK:  Mr. Barnett and Ms. Camina.  And our --

7    our clients, my firm's clients, believed in good faith that

8    the Court's Protective Order permitted New Century access

9    to information that was in New Century's possession at the

10   time when litigation began.  They knew that commercial use

11   was prohibited under the Preliminary Injunction and, to

12   their knowledge, no commercial use was ever made of that

13   software.

14       I know the Court had a different view of the Protective

15   Order, and understandably so.  But at least as far as --

16   as the evidence is concerned, we think that the record is

17   clear--and I don't mean this to be an excuse but really just

18   an explanation--that as far as our clients were concerned,

19   they believed that being able to use information that was

20   in your possession at the time the litigation began was

21   reasonable under normal protective orders.

22       And I understand that the Court thought otherwise.

23           THE COURT:  Yeah.  And the whole point of the

24   lawsuit was to keep you-all from using that information.

25           MR. BECK:  I -- I --

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1         THE COURT:  That seems a weird construction of

2    the Order, but we've already been through all that.

3         MR. BECK:  Yes, sir.  And -- and I won't spend

4    any more time on that.  I just wanted to make sure that

5    the Court was aware of exactly what our clients' position

6    was in the case.

7      Let me turn now to the November 2000 version of

8    LoanForce, and let me try to recite some key facts.

9         THE COURT:  Let's -- before you do, let's back

10   up.  And this is my fault.  I don't know that I was ever

11   sufficiently clear with you-all about what I was troubled

12   by, and it wasn't restoring backups in order to comply with

13   requests for production in the arbitration.  I understand

14   how that happened.

15     It was restoring it for Mr. Norment to use -- and

16   actually I don't know that that was a restoration, it was

17   just never purged.  It was telling me, don't worry, it's

18   under lock and key in Legal, and then, come to find out,

19   your chief technology officer who is supposedly overseeing

20   the clean room development of the replacement product, had

21   ongoing access to it --

22         MR. BECK:  Let me --

23         THE COURT:  -- when I thought it was under lock

24   and key in Legal and possibly one of the very key persons

25   I would not want to have access to it, had access to it,

Page 88

1    and the only reason that wasn't expressly prohibited in

2    the injunction is I had been assured that that wasn't a

3    problem --

4              MR. BECK:  Yes.

5              THE COURT:  -- and you don't need to worry about

6    it.

7              MR. BECK:  Yes, sir.  And I understand the Court's

8    concern.  John Norment was clearly the chief technology

9    officer of New Century.  He was assigned to help with

10   discovery in the litigation.  Our clients, Ms. Camina and

11   Mr. Barnett, needed some help, some technical help to be

12   able to respond in discovery.

13             THE COURT:  This wasn't responding to discovery.

14   The restoration to provide a copy to the plaintiffs I

15   understand.  This was doing an independent analysis of

16   the software.

17             MR. BECK:  Well, he -- he was never to have had

18   access to any confidential information produced by Positive

19   in this litigation or in the arbitration, for that matter.

20   He did compare for litigation purposes a version of

21   LoanForce as it existed on New Century servers as of

22   April 9, 2003.  There are no question about that.

23        Our clients, Ms. Camina and -- and Mr. Barnett,

24   believed that it was permissible for him to -- to review

25   materials in our possession at the time.  And we believe

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 89

1    that's what he in fact did.

2         Now, what he did was absolutely useless and wasn't

3    even used in the arbitration.  But at least from what we

4    understand, they reasonably believed that what he was

5    in fact doing was using information that was already in

6    possession of our client, New Century--let me clarify

7    that--before the litigation began.

8              THE COURT:  I had understood that, in part,

9    Mr. Barnett's response to the concern that I just

10   mentioned to you was he didn't know it was happening.  He

11   just didn't know.  And by the time he found out about the

12   Norment analysis, it became disclosed to the Court shortly

13   thereafter.  Did I understand that correctly or not?

14             MR. BECK:  No, I think that's exactly right.

15             THE COURT:  Okay.

16             MR. BECK:  I mean, this suddenly came out of the

17   blue.  There's evidence in the record nobody asked him to

18   do this.  It suddenly showed up out blue.

19        So there's no evidence, at least that I've seen in this

20   record, that suggests that either Mr. Barnett or Ms. Camina

21   said, John Norment, here's what we want you to do, and

22   somehow gave him information that arguably was protected

23   by the Court's Protective Order.

24             THE COURT:  And separate and apart from the

25   Protective Order, I had been assured by Mr. Barnett that

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    it was not available to him.

2                MR. BECK:  Well, it -- it should not have been

3    available to him.  And -- and, again, Your Honor, I go back

4    to the point that we -- we believe what Mr. Norment was

5    using was information that was already in New Century's

6    possession at the time of the litigation.  And so at least

7    under the construction of the Protective Order -- and we

8    know the Court has a different view --

9                THE COURT:  Yeah.

10               MR. BECK:  -- but we believed that was

11   permissible.

12               THE COURT:  My issue with regard to the show cause

13   was not the Protective Order.  It was the representation by

14   Mr. Barnett, don't worry, it's under lock and key at Legal,

15   and then find out, no, it's not.

16               MR. BECK:  And -- and I think the short answer

17   is he believed that to be true, that was represented to

18   him to be true, and he relied upon that to be true.

19         If I may turn now to the November 2000 version of

20   LoanForce, and -- and this gets awfully confusing, Your

21   Honor, with all these versions floating around.

22         In August of 2004, as the Court knows, Positive claimed

23   that it lost the November 2000 script and that was why it

24   asked New Century for what it called the earliest version

25   of LoanForce.  And their argument was that that wasn't

Linda J. Robbins, CSR, RDR, CRR

Page 91

 1    produced during the arbitration and somehow that skewed

 2    the arbitration and that's why they lost and repeated that

 3    allegation in the amicus brief they filed before Your Honor

 4    in the show cause.

 5         We initially responded, when we heard this in the show

 6    cause, by saying we don't know why this wasn't produced.

 7    We believed them when they said that it wasn't produced.

 8    We said we don't know -- if it wasn't produced, we don't

 9    know why it wasn't produced in the case.  It should have

10    been produced.

11         But we also said that, contrary to what they now say

12    that this is somehow a -- a -- a riveting document, an

13    important document, a highly critical document, the fact

14    of the matter is it was totally unimportant in any event

15    because the reason that Positive lost the arbitration was

16    because they failed to compare the registered software side

17    by side with the accused software, which is what the Fifth

18    Circuit, as the Court knows in the Brigman (phon.) case,

19    says you have to do in the case.

20         Now, they -- their fallback argument is, well, if we'd

21    have had this, we'd have registered it.  Well, the fact of

22    the matter is that they did have it and we now know that

23    they had it.  But our position is that it --

24              THE COURT:  But you didn't know that they had it

25    and they didn't know that they had it.

U.S. District Court

Page 92

1            MR. BECK:  Exactly.  I mean, that -- that's

2   correct.  We didn't know that they didn't have it until

3   this week when -- or I guess it was last week now, when --

4   when we find out that -- that they did in fact have it.

5        They say they didn't know they have it.  I don't know

6   whether that's accurate or not.  They initially said they

7   didn't have it.  We now know that was incorrect.  But the

8   point is, we believed them.  And so our response initially

9   was that, you know, it should have been produced if you --

10  if you didn't get it.

11       But in the big picture it doesn't make a hill of

12  beans because in the big picture you lost for a totally

13  different reason.  Whether that was a mistake on their

14  part, I don't know.

15       What Positive -- and the Court knows we asked them,

16  because of defenses we were pursuing, give us what you

17  initially gave us.  And what they gave us was not the

18  November 9 version.  They gave us the November 26th

19  version of LoanForce.

20       We had asked them to produce the original version of

21  LoanForce that they provided to us.  And we understood

22  that what they gave us was the original version, the

23  November 26th version.

24       And -- and if -- if that was LoanForce as delivered

25  to New Century, the question is, why didn't they even

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    introduce that into evidence?  If they didn't know, as

2    they are claiming, about the November 9, 2000 version and

3    they represented to us in discovery that the November 26th,

4    2000 version was really the original version, why didn't

5    they even introduce that into evidence in the arbitration?

6    It was marked as an exhibit.  It was R-651.  And they never

7    even introduced it into evidence.

8         Now, Positive had versions of LoanForce that predated

9    what they registered.  And as the Court knows, they

10   registered the December 2002/January 2003 version.  That's

11   what they chose to register.  And they're now trying to have

12   this Court believe that, oh, no, we would have registered

13   a much earlier version, even though there were subsequent

14   iterations that hopefully improved on the software.  That

15   makes no sense at all.  And by registering that version,

16   they chose not to register any earlier version, including

17   the November 26th version.

18        In any event, Positive had -- we now know they had

19   the November 9, 2000 version all along.  We produced it on

20   November 21, 2003.  Significantly, Your Honor, they gave

21   the original version to their expert, a Professor Etchison.

22   Professor Etchison had it but was not asked to tell the

23   operator anything about it.

24             THE COURT:  The November 9 or November 26?

25             MR. BECK:  Well, if -- if you look at the

Page 94

1   transcript, we believe it was the November 9, 2000 script

2   that she was talking about, because she was not only

3   questioned about that on cross-examination, even the

4   arbitrator asked her, now, wait a minute, when you say

5   the original version, what are you talking about?

6        And she got this from Mr. Mandel, at least the way I

7   construed the testimony.  We've cited that to the Court

8   in one of our filings.  Their own expert had a copy of

9   the November 9, 2000 version, and again they chose not to

10  use it.  They -- again they chose not to even tell the

11  arbitrator about it.

12       And now they're trying to have you say that's the

13  centerpiece of why we lost this arbitration.  That makes

14  absolutely no sense and is really rebutted by the record

15  itself.

16       So, Your Honor, our position is that with respect to

17  the November 2000 version of LoanForce, they had it, they

18  knew they had it, their expert had it, and they elected

19  not to use it top, side, or bottom.

20       Now, let me go back to --

21            THE COURT:  In terms of the disciplinary

22  proceeding, I think the question more is, why didn't

23  Ms. Camina produce it as opposed to what use would they

24  have made of it and whether it would have altered the

25  outcome.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1          And I understand your answer to that is because of

2     the trial that she had in the other matter, she delegated

3     that to the other people on the trial team, and for

4     whatever reason they didn't do it.  But as far as her,

5     she delegated that responsibility to other people to

6     handle and then went to trial in the other matter.

7               MR. BECK:  Right.  Judge, I wish there was a

8     better answer.  I mean, the bottom line is that it fell

9     through the cracks just as was -- as was testified.

10              THE COURT:  But that wasn't her fault.  She

11    delegated that to other people --

12              MR. BECK:  She delegated it.  But -- but, you

13    know, ultimately our clients--and, again, I'm talking

14    about Mr. Barnett and Ms. Camina--I mean, they're -- they

15    are responsible.  There's no question about it.  I mean,

16    when you try a lawsuit, it's a team effort in the case.

17    Now, Mr. Barnett was senior, and he's -- he's accepted

18    responsibility for that.

19         But we get back to what was really happening here,

20    because when Ms. Camina found out about the -- the so-called

21    Norment version, what they call the Norment version, what

22    she told the Court in the declaration, she says, I didn't

23    even know what it was.  And her exact words were, I thought

24    it odd that there would be a script several times larger and

25    two weeks earlier than a version that Positive sent to us in

Linda J. Robbins, CSR, RDR, CRR

Page 96

 1    response to discovery and said it was the original version.

 2         So it raised questions in her mind about precisely what

 3    it was.  But clearly -- and you have seen the e-mails where

 4    she said, all right, I'm going to trial, she delegated that

 5    to somebody else, and it flat fell through the cracks.  And

 6    I don't -- you know, I wish there was a better answer for

 7    that.  We made a mistake.  There's no question about it.

 8         Now, under Local Rule 83.8(b), which Your Honor cited,

 9    and I believe it's in the Court's September 28th, 2004

10    opinion, you made reference to a perceived violation of the

11    lawyer's duty of candor to the Court.  And I assume you're

12    talking about Texas Rule of Professional Conduct 3.03.

13         That rule, as the Court well, knows, prohibits a lawyer

14    from knowingly making a false statement of material fact

15    to a tribunal.  Knowingly means having actual knowledge

16    of the facts.  And then there, of course, is the clear

17    and convincing evidence standard which applies here.

18         I would submit to Your Honor that neither Mr. Barnett

19    nor Ms. Camina knowingly represented -- misrepresented

20    facts to the Court.

21              THE COURT:  But, just as a legal matter, I think

22    there's at least some authority that says if you unknowingly

23    make a false statement and then later come to find out it is

24    false, you have some duty to correct.

25              MR. BECK:  I think you're correct, Your Honor.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 97

1    I think you're correct on that.

2        But neither Mr. Barnett nor Ms. Camina knowingly

3    represented any fact to this Court -- when Mr. Barnett

4    told this Court that New Century had deleted the LoanForce

5    software from its active servers, he believed it.  He

6    believed it at the time.  That's what he was told by his

7    client.  His client represented to him that that had

8    occurred.

9        And when there was a -- a restoration, as I said, he

10   should have told the Court that there was a restoration.

11   He didn't do so, as I said earlier, because the arbitrator

12   was supervising all of the discovery under an identical

13   Protective Order.  But clearly, in hindsight, he should

14   have gone back to Your Honor, and I think he's acknowledged

15   that.  I don't think there's any question about that at all.

16       But neither Mr. Barnett nor Ms. Camina intentionally

17   disobeyed either this Court's Protective Order or the

18   Preliminary Injunction.  They believed that -- that

19   New Century employees were permitted to have access to

20   information in their possession at the time of suit as

21   long as it was not used for commercial purpose.  And they

22   never knew whether anything was ever used for commercial

23   purposes, and to their knowledge, it was not.

24       Now, in conclusion, as this Court well knows, the

25   practice of law is not a science.  It's an art.  Lawyers

Page 98

1    make judgments.  Trial lawyers make judgments, but they

2    make judgments in the heat of battle.

3         The underlying case, as I have familiarized myself

4    with it, is probably the most contentious and heated

5    lawsuit or arbitration I have ever witnessed in my 35 years

6    of practice.  I have never seen anything like that in my

7    life.

8         I have never seen a case where repeated motions for

9    contempt, repeated motions to strike pleading, repeated

10   motions for sanction -- we even had a motion for sanctions

11   filed against our firm in this case.  Because they

12   complained they didn't want Susman & Godfrey responding

13   to their discovery requests, we said, fine, so we did it.

14        And then when they asked for a 30(b)(6) deposition, we

15   put up Mr. Fogler, much to his regret, and then they filed a

16   suit for sanctions -- filed a motion for sanctions against

17   him.  But I've never seen such a heated case in my life.

18        And those -- that was the situation in a compressed

19   period of time when these kind of judgments were being made

20   by Mr. Barnett and Ms. Camina.

21        Lawyers make mistakes in exercising judgments.  Good

22   lawyers make mistakes in exercising judgments.  Good lawyers

23   with excellent reputations make mistakes.  But that doesn't

24   mean, Your Honor, respectfully, that they are acting in bad

25   faith, that they are acting knowingly, or that they're not

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 99

1  being candid with the Court.

2       The affidavits that you have before you from respected

3  members of the Bar in this community attest to the -- to

4  the reputations and integrity of both Mr. Barnett and

5  Ms. Camina.  Lawyers like Mr. Barnett and Ms. Camina don't

6  get those reputations by flaunting court orders, acting in

7  bad faith, or being less than candid with courts.  That

8  just doesn't happen.

9       And during the years that they've practiced, they

10  have built and developed their reputations, which has been

11  attested to by other members of the Bar.  They practice at

12  a very high ethical and professional level because it's the

13  right thing to do, not because of the enormous consequences

14  that flow when they don't.

15       Now, as Your Honor well knows, they (indicating) have

16  seen every privileged document that was developed during

17  our -- Mr. Barnett and Ms. Camina's representation of New

18  Century, documents which -- which were never meant to see

19  the light of day because they were privileged documents.

20  They've got all those documents.  They've got all of our

21  work product documents.

22       Your Honor, I would respectfully submit that if -- if

23  we were allowed to go through most trial lawyers' files,

24  privileged files, work products files, and we were creative,

25  we could make some kind of an argument that somehow somebody

1    didn't honor a discovery response.  Maybe right, maybe

2    wrong, but we could certainly make that kind of an argument.

3         And you can certainly use words like "perjury" and

4    "subornation of perjury" and "arrogance" and -- and words

5    like that, but that doesn't make them true.

6         And we respectfully submit that the evidence in this

7    case shows that Mr. Barnett and Ms. Camina made mistakes,

8    but they certainly did not act in bad faith or act knowingly

9    or want to violate a court order.

10        They have acknowledged the mistakes they've made,

11   they're embarrassed by them, they deeply regret what has

12   happened, and frankly they've already suffered enormous

13   consequences.  But regardless of what you do now with

14   respect to this show cause, nothing can undo what has

15   already been done.

16        There's an opinion dated September 2004 that questions

17   their character, professionalism, and integrity.  That's

18   on the books.  That's not going to go away.  There are

19   pleadings in this proceeding that are now made public.

20   That's not going to go away.  And the articles that have

21   been printed in the Texas Lawyer and other kind of magazine,

22   that's not going to go away, either.

23        In conclusion, Your Honor, I'd simply say that -- that

24   these lawyers, these two lawyers, are good lawyers and

25   they've really suffered enough.  And, respectfully, we

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 101

1    would ask that they not be disciplined any further.

2         Thank you, Your Honor.

3              MR. FOGLER:  May it please the Court, I'd like to

4    pick up on a subject that Mr. Beck has initially discussed

5    because I believe it is one of the central issues in the

6    case, and that is the November 9, 2000 script.

7         As we have discussed in our prehearing brief that we

8    filed a few days ago, Your Honor, it turns out that we

9    found two significant pieces of evidence that disclose that

10   Positive had the original version of LoanForce all along.

11        There's been some discussion already, of course, about

12   the hard copy of the script that we produced on November 21,

13   2003.  I want to come back to that because they've said in

14   their discussion this morning that it was clouded, hidden,

15   misrepresented.  And we'll talk about that in just a minute.

16        But -- but there was no discussion by Mr. Shore about

17   the testimony, the -- the evidence that their own expert

18   was provided a copy of the original LoanForce database as

19   delivered to New Century.

20        She was asked -- Professor Etchison was asked on

21   cross-examination if she had made any study to determine

22   if the changes made in the LoanForce database as reflected

23   in your comparisons came from New Century or Positive.

24        Your Honor, this was a -- an important defensive issue

25   by New Century, not important to Positive, but we wanted

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 102

1    to prove, that is, New Century, wanted to prove in the

2    underlying arbitration that the improvements, the

3    modifications that had been made to the original version of

4    LoanForce, had been made by New Century, not by Positive,

5    and were therefore owned by New Century and not Positive.

6         Professor Etchison said, yes, she did make such a study.

7    She looked at the e-mail, she said, and then she was asked,

8    "Aside from looking at the e-mails, what else did you do?

9         She said, "I compared to see if it existed on the

10   original database of LoanForce."

11        The arbitrator listened to the cross-examination and

12   afterwards he had some questions for Professor Etchison.

13   He said, "A couple of times you used the term or you stated

14   that you compared something to the original LoanForce

15   database.  What did you mean by the original LoanForce

16   database?"

17        She said, "I thought it was important to my analysis

18   to receive what Positive Software delivered to New Century.

19   And so I received a -- I asked Ed Mandel for a copy of what

20   exactly it was that he delivered to New Century.  And that's

21   what I mean by that statement."

22        Arbitrator, "That thing that Mr. Mandel says he

23   delivered, what was the date on it, or if there is any

24   date information on it to give you a date?"

25        She says she doesn't recall.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 103

1          What was clear as a result of the exchange that was

2     between Mr. Barnett and Professor Etchison and then the

3     arbitrator was that Mr. Mandel gave to Professor Etchison

4     what he called the original LoanForce database that was

5     delivered to New Century.  She looked at it.  She compared

6     it with later versions of LoanForce.  She concluded that she

7     could not make any determination about who made the changes

8     in LoanForce, whether it was Positive or New Century.  And

9     the subject was dropped.

10          Positive did not produce in the underlying arbitration

11     any transmittal or communication from Mr. Mandel or from

12     Positive to Professor Etchison that enclosed this original

13     LoanForce database, did not produce whatever analysis

14     she made.  In fact, we know that Professor Etchison has

15     testified in her deposition that she had an entire stack of

16     materials containing her notes that she threw away after

17     she had finished her report.

18          So perhaps we'll never know what version of the

19     LoanForce database she got from Mr. Mandel.  But what we do

20     know, Your Honor, is that Mandel has submitted a declaration

21     in the show cause proceeding in which he swears that the

22     November 26th script which was produced by Positive to New

23     Century is not any SQL code, is not LoanForce database, and

24     that's not what was the as -- original as-delivered version

25     of LoanForce.  That's what Mr. Mandel says.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1        So what -- and we also know that because the version

2   that we produced on November 21st, the hard copy script,

3   was stamped highly confidential, he wasn't supposed to have

4   that.  So he must have had some other original version.  It

5   must have been another copy of this November 9, 2000 script.

6        The importance of this, Your Honor, is that we now know

7   that there was nothing that we did that caused any harm to

8   Positive Software.  They had the original version of the

9   LoanForce database script.

10       They could have registered it if they had wanted to.

11  They chose not to.  They gave it to an expert to review and

12  analyze and they could have had her discuss it and provide

13  her analysis, but they chose not to.  They could have

14  offered it into evidence at the arbitration, but they

15  chose not to.  Those were decisions they made.

16       But what we do know is that any failure by our side,

17  New Century or the Susman Godfrey lawyers, to produce an

18  electronic version of the November 9, 2000 software could

19  not have caused them any harm.

20       And, by the way, I'm showing counsel a copy of what

21  was produced on November 21st of 2003.  Presumably it's in

22  the stack that Mr. Shore showed you.  In fact, I'd like to

23  mark it as an exhibit and offer it into evidence.

24            MR. SHORE:  No objection.  We'd only ask that the

25  entire stack as it was produced, actually was produced, be

1    the exhibit.

2              THE COURT:  If you want to offer that in your

3    rebuttal, that's fine.

4              MR. SHORE:  No objection.

5              THE COURT:  What is that marked as?

6              MR. FOGLER:  We'll mark this as Respondent's

7    Exhibit 1.

8              THE COURT:  Respondent's 1 is admitted.

9              MR. FOGLER:  This proceeding has a number of

10   ironies.  One of the ironies is that now the Susman Godfrey

11   lawyers are accused of allegedly knowing precisely what

12   John Norment discovered when he sent the electronic version

13   of this script on December 19 of 2003.  They are supposed

14   to have known everything about it.

15       And yet the people who actually wrote LoanForce, who

16   were prosecuting the case, who claim that it had been copied

17   and infringed, they get 300-plus pages of script.  Every

18   line, Your Honor--you may take a look--is dated November 9,

19   2000.

20       And there's no secret about the date.  They say it was

21   clouded, it was hidden.  We have letters from them saying,

22   we got these documents and we looked at them.  They were

23   complaining about other things that weren't being produced

24   at the same time, and we're supposed to believe that they

25   did not know what their own code was.

Linda J. Robbins, CSR, RDR, CRR

Page 106

1      What -- what this all means in terms of a motion for
2   sanctions, Your Honor, to the extent that there was anything
3   left of their claim that they deserve compensatory damages,
4   that is, what they should have recovered in the arbitration
5   but for the fact they didn't have this critical piece of
6   evidence, that's gone.

7      We now know they had it, could have used it, decided
8   not to, didn't help, and we know that they lost the
9   arbitration not because they didn't have this important
10  document but because they failed to make the proper proof.

11     The fact that they had this code also affects their
12  rather exorbitant claim for attorneys' fees, which I'll
13  talk about in just a little bit.  Mr. Shore likes to talk
14  about a pattern on the Susman Godfrey's part.  And there
15  is a pattern here, but it is Positive's pattern of accusing
16  us of not producing documents which they actually got.

17     I can tell you that, as the person who was responsible
18  for producing all of the privilege materials in this
19  proceeding, that it happened time and again that they
20  accused us of not producing things and us having to point
21  out the specific Bates numbers where the documents were
22  actually produced.

23     For example, we didn't get Dr. Pooch's time records
24  and his travel records so that we could prove that he wasn't
25  in New Century's offices except for April 22.  So we write

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Page 107

 1  him a letter and we say, no, here are the Bates numbers.

 2       Well, you didn't produce anything that showed any

 3  analysis of the five arbitrator candidates with Mr. Shurn.

 4  So we tell him, here's the Bates number, here it is.

 5       This kind of thing happens in contested litigation,

 6  particularly where there's lots of documents, both hard

 7  copy and electronic that are being produced.  But perhaps

 8  another example that we should talk about relates to this

 9  VSS.

10       When you have a case that is as contentious as this one

11  was, there was an incredible amount of back and forth about

12  what the requests mean, what was being objected to, what

13  the arbitrator ruled, what was possible to do, what was

14  burdensome to do.  There was back and forth in terms of

15  letters, phone calls, hearings in front of the arbitrator

16  on a continual basis.

17       With respect to the VSS, you're not going to find

18  any specific request from Positive that says we want

19  Virtual (sic) SourceSafe databases or even Virtual (sic)

20  SourceSafe's logs.

21       Your Honor, I have to make a confession.  I am not a

22  software expert.  I don't know very much about this stuff.

23  I have been told, however, that when they requested the

24  software code vaulting, that they wanted the software like

25  VSS that a developer would use to log changes made in the

Linda J. Robbins, CSR, RDR, CRR

Page 108

1    development of the software.  That's what I've been told.

2    I hope it's right.

3        We objected.  We, meaning New Century and the Susman

4    Godfrey lawyers, objected to that request.  The arbitrator

5    sustained the objection to that request.  Nevertheless,

6    ironically, it's in this stack because on November 21, as

7    part of the production that New Century made to Positive,

8    they included the complete VSS logs as they existed at

9    that point in time for LoanTrack-1, LoanTrack-2, and mLAS.

10       Now, it's interesting that the way this comes up--Mr.

11   Shore mentioned this in his presentation--New Century was

12   not the developer of LoanForce, so New Century did not

13   have a VSS database or any VSS logs for LoanForce.  So

14   when we're trying -- there's an occasional merging of

15   theories and ideas in some of Positive's presentations

16   as if the VSS log would have helped them determine the

17   earliest version of LoanForce.  That's not correct.

18       They were apparently seeking different versions of

19   mLAS, LoanTrack-2, and LoanTrack-1.  And as you saw from

20   the e-mail that was shown on the screen from John Norment on

21   December 10 of 2003, he tells Ms. Camina, we have already

22   produced the following versions of those programs to

23   Positive.  They have them.

24       They had the ability to make comparisons between the

25   LoanForce software that they registered and those production

U.S. District Court

1   versions of mLAS, LoanTrack-2, and LoanTrack-1.  That's

2   what they were supposed to do if they wanted to prove

3   copying or infringement.  They just failed to do that.

4       But this example of the production of the VSS logs

5   is just another example of the way Positive shoots first

6   and asks questions later.  Maybe they didn't realize that

7   the VSS logs were in this stack of November 21st, 2003

8   documents either.  I find that difficult to believe.  But

9   they are there.  They got them.

10      If they wanted to follow up on them, believe me,

11  there are innumerable letters from Positive during

12  that time period following up on document productions,

13  complaining about their insufficiency, asking for additional

14  information, asking for a clarification.  But there are no

15  documents, no requests, no follow-ups saying, we got these

16  documents but we want more, about the VSS.

17      This type of pattern of making accusations first and

18  then trying to weave the proof creating historical fiction

19  to try to supply the proof raises an important point.  It

20  would be inappropriate to sanction Mr. Barnett or Ms. Camina

21  or the law firm of Susman Godfrey merely because Positive

22  makes an allegation of wrongdoing.

23      They have a burden of proof.  It's not merely

24  supposition; it's not inference.  They have to provide

25  clear and convincing evidence of bad faith.  That's their

1    burden.

2         And there's a reason why the bar is set so high in a

3    sanctions proceeding, or for that matter a disciplinary

4    proceeding like the show cause.  The reason is that we

5    are talking about what is -- what it means to be a lawyer,

6    what is at the heart of being a lawyer.

7         The Court's power -- to use an overused word in

8    today's environment, the Court's power is awesome.  The

9    Court has the power to affect, perhaps even destroy, a

10   lawyer's reputation.  It's a power to be used sparingly

11   and cautiously.  That's why the bar is set so high.

12        So with that in mind, let's look at some of the other

13   charges that have been leveled.  I was going to talk about

14   the -- the allegation that Ms. Camina lied about knowing

15   Mr. Shurn.  We didn't hear anything about that.  Maybe

16   that's something that's not all that important anymore.

17   But I do think it -- because it's something that they

18   spent a great deal of time on in their earlier papers,

19   that it's an example of how they have completely failed to

20   meet their burden.  So let me just briefly discuss this.

21        Of course -- and -- and, by the way, I mean, this is

22   not an allegation where Positive suffered any harm here.

23   This is where they are in their prosecutorial position

24   concerned about Ms. Camina's candor to the Court.

25        Here are the facts.  She believed, when Mr. Shurn's

Linda J. Robbins, CSR, RDR, CRR

1    name showed up as a candidate to be the arbitrator, that

2    she knew him from a prior case.  She told the client that

3    she believed she knew Mr. Shurn.

4        At that point she had no duty to tell Positive

5    Software that she knew Mr. Shurn.  She had no duty to the

6    Court at that point, either, with respect to the arbitrator

7    candidates.

8        But the important fact here is that New Century, as a

9    result of the information that was provided about the five

10   candidates, ranked Mr. Shurn third.  It was Positive's

11   ranking of Mr. Shurn as first that caused him to be chosen.

12       Later, of course, Ms. Camina watched a videotape of

13   Peter Shurn giving a CLE presentation.  She discovered at

14   that point that's not the person she thought she knew.  She

15   didn't have any obligation at that point to tell Positive

16   about that, either.

17       After the award, of course, we know that Positive

18   accused Mr. Shurn of failing to disclose his prior

19   association with Susman Godfrey.  Ms. Camina submitted a

20   declaration in response to that allegation that she did

21   not know Mr. Shurn previously and had not worked with him.

22       Where is the evidence that her declaration was

23   incorrect?  Maybe more to the point, where is the clear

24   and convincing evidence that what Ms. Camina said was

25   deliberately incorrect?

1      There are many examples of Positive taking documents

2   out of context and inferring conclusions from them that are

3   unsupported by the language of the documents themselves.

4   Let's talk as an example about the documents that are

5   related to New Century's fraud claim against Positive.

6      To refresh the Court's memory, New Century claimed in

7   the arbitration that Positive in a January 28, 2003 phone

8   call had misled New Century into believing that it would

9   renew the software license for LoanForce.  But, instead, a

10  week later Positive turned off the key and filed a lawsuit.

11     New Century claimed that was fraud.  The arbitrator

12  agreed it was fraud.  That issue has been determined to be

13  fraud.

14     Now we are told, however, that there are a couple of

15  documents which purportedly contradict that conclusion:

16  the so-called LoanForce support plan and the Lemieux

17  alternatives.  We certainly invite the Court to read those

18  documents.  They are a couple of pages long.  They're not

19  very lengthy; they're very cryptic.

20     There is absolutely no indication in either of

21  those documents which could constitute an admission or a

22  confession that New Century knew Positive was going to

23  turn off the software key and sue them.  In fact, it's the

24  opposite.  They are trying to come up with alternatives to

25  deal with any scenario.

Linda J. Robbins, CSR, RDR, CRR

Page 113

1        This claim, by the way, like many of the other

2    arguments that they make, is one that is barred by the

3    actual findings of the arbitrator.  I couldn't help but

4    think, as we're listening to Mr. Shore's presentation, that

5    this was almost like an appeal of the arbitrator's rulings

6    on discovery and his rulings on the merits.

7        They're unhappy.  I understand that.  But, for example,

8    when they talk about the argument that mLAS was not actually

9    designed in a clean room environment and used pieces of

10   LoanForce or copied pieces of LoanForce or stole, whatever

11   word you want to use, those are the precise arguments, Your

12   Honor, that they made to the arbitrator.  That was a central

13   issue in the arbitration.  Did mLAS contain LoanForce?  Did

14   it copy LoanForce?

15           THE COURT:  The arbitration award was never

16   confirmed.  In fact, I think but for the bankruptcy and

17   the settlement, there was at least still before the Court

18   a serious question as to whether it should be vacated on

19   other grounds, some of which are related to the subject

20   matter of this proceeding.

21       In that circumstance, how is the arbitrator's finding

22   possibly binding on me?

23           MR. FOGLER:  It is still a final award, Your

24   Honor.  Whether it has been -- it will never be confirmed or

25   vacated now because the parties settled, that is, Positive

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    and New Century settled.  But it is still a binding final

2    decision by the decision maker chosen by the parties.

3              THE COURT:  Binding in what sense?  It was never

4    merged into a judgment, it was never confirmed, and it was

5    under active attack at the time the case was settled.

6              MR. FOGLER:  I -- I believe, Your Honor, that

7    there is case law that an arbitrator's award, whether

8    confirmed or not, is binding on the parties because that's

9    what they contractually agreed to in their agreement.  They

10   agreed that the decision of the arbitrator would be binding.

11   And I believe that it has that effect, whether it is

12   actually confirmed or not.

13        But my point is that these are the same arguments that

14   they have already made or heard and have been rejected.

15        Please don't misunderstand me, Your Honor.  Our conduct

16   here was not perfect.  As Mr. Beck has already indicated,

17   we made mistakes.  There are several items that have been

18   identified now as a result of all of the production that we

19   have made that were not produced.

20        We can start by the -- by talking about the electronic

21   version of the November 9 script.  We can debate all we

22   want about whether it had been specifically requested.

23   We've made some points in our initial declarations to

24   the Court about that.  And, of course, now we know that

25   a hard copy, and I believe it to be an exact hard copy,

Linda J. Robbins, CSR, RDR, CRR

1    a line-for-line duplicate, of the electronic version.

2              THE COURT:  Out of curiosity, have you checked?

3              MR. FOGLER:  I have not, but I sent it to a

4    software person who would have the ability to do that.

5    So I was satisfied that it was the same.

6              THE COURT:  Okay.

7              MR. FOGLER:  And we haven't heard differently here

8    from Positive, either, so I think they have checked -- they

9    must have checked it and believed that it's the same.

10             THE COURT:  I thought I heard a suggestion from

11   Mr. Shore that it might be different.

12             MR. FOGLER:  I -- I cannot personally vouch for

13   it.  I wouldn't know one line of script from another.  It

14   wouldn't make any difference for me to look at it.

15             THE COURT:  Uh-huh.  But someone you rely on has

16   verified that for you.

17             MR. FOGLER:  Yes.

18             THE COURT:  Okay.

19             MR. FOGLER:  I will tell you that Mr. Barnett

20   and Ms. Camina were examined at great length in their

21   depositions about this.  They both said they regretted that

22   it had not been produced.  They wished that it had been

23   produced because it was not, as it turns out, important to

24   the case and it would have avoided much of the controversy

25   that we now face.

1        I do want to make one aside here because it -- it --

2    before I talk about some of these other documents that

3    weren't produced.  We have heard for quite a while, Your

4    Honor, that this November 9, 2000 script was found by

5    Mr. Norment on the Nitrogen server which was some kind

6    of active development server or now perhaps a production

7    server.

8        Mr. Barnett and Ms. Camina scratched their heads over

9    that allegation.  They testified in their deposition that

10   they weren't personally aware of where this script was found

11   by Mr. Norment.  He never told us.  And we had stated in our

12   pleadings that we're not sure where it was found.  And for

13   all we know, it could have been found on a backup that had

14   been restored.

15       So we were curious when we heard Mr. Shore in his

16   opening this morning professing to have proof that it was

17   found on the Nitrogen server and he even provided the Court

18   with a copy of some directory from the hard drive that

19   purportedly shows that it was found on the Nitrogen server.

20       Again, with some apologies for my ignorance, I looked

21   at this tab.  Look at tab 23 in their presentation.  And I

22   see that there are two files from the Nitrogen server that

23   are one kilobyte that are not the full LoanForce database

24   script.  They are not -- don't appear to me to be SQL files.

25   And so I'm still wondering, where is the proof that this

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1    was still on an active server at the time that Mr. Norment

2    found it?  It's not there.

3         We don't know, Your Honor, even to this day, whether

4    the purge was perfect or not.  What we do know is that

5    Mr. Barnett and Ms. Camina, like all lawyers who deal

6    with situations just like this, were entitled to rely on

7    representations from their client and from their expert

8    who say they performed the purge.

9         When Dr. Pooch submitted his declaration to the Court

10   in April of 2003 and he said, in my opinion New Century has

11   been satisfactorily cleansed of LoanForce, they had every

12   reason to believe it.

13        When Mr. Norment sent this November 9 script, by the

14   way, in December of 2003 to Ms. Camina, as we've tried to

15   do in our papers, you must place it in the context of what

16   Ms. Camina had been told by Positive before December 19,

17   2003.

18        There had been much discussion, much teeth gnashing and

19   back and forthing about New Century's request to Positive

20   to produce the as-provided portion of LoanForce.  Positive

21   objected.  New Century filed a motion to compel.  Positive

22   filed a response ultimately saying, we will produce the

23   as-provided version to you, and they delivered a CD-K--that

24   was how it was labeled, CD-K--that contained this November 26

25   script.

1        In my view it is perfectly reasonable for a lawyer to

2    rely on the representations of opposing parties that what is

3    being produced is what is -- what is what they represent it

4    to be.  When they say that this is in response to your

5    request for LoanForce as-provided, they believed it.

6        So when Mr. Norment sends another script that's bigger,

7    earlier, different than what they had, of course it raised

8    questions in their mind about what it was.  Could it be

9    TeleTrend?  Could it be something different?

10       Ms. Camina urged her team to consider that and to send

11   it to Dr. Pooch so that he could review it.  Obviously it

12   would be produced at that point.

13       When she went to trial, Mr. Barnett asked, has this

14   been produced?  He couldn't open it.  He didn't know what

15   it was.  But in the heat of all of the other things that

16   were going on at that time in January of 2004, the ball was

17   dropped and it didn't get produced.  It should have, we

18   regret that it wasn't, but it didn't have any impact on

19   the case.

20       They also complain about a number of items that

21   Dr. Pooch had that were not produced.  Let's talk about

22   those quickly.

23       There was a draft report that Dr. Pooch prepared.

24   They have it now.  They haven't shown you that draft

25   compared with the final version because it is so similar,

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 119

1    the changes were so cosmetic and unimportant, that their

2    lack of that particular document could not have caused

3    them any harm.

4         But, nevertheless, it was a mistake.  It should have

5    been produced.  There's no question that Dr. Pooch's draft

6    report should have been produced.

7         It is not an excuse, Judge, and we're not making it

8    as an excuse that Professor Etchison, their expert, didn't

9    produce any drafts or that she destroyed all of her papers.

10   But I use that as an example, though, to show that how, in

11   the heat of this contentious litigation fight, mistakes

12   occur.

13        There was a voicemail from Dr. Pooch.  It was

14   transcribed.  It was placed not in Dr. Pooch's expert

15   witness file where it would have been found and produced

16   but was somewhere else.  It was on the I-Manage document

17   management system that -- that we produced among the

18   papers that we had.  It, too, should have been produced.

19   We're not offering any excuse.  It should have been

20   produced, but it wasn't.

21        But what we see with respect to this voicemail is

22   another example of taking the words that are on the paper

23   and weaving a story that is completely and totally

24   unsupported by the facts.  It's just complete fiction,

25   Judge.

U.S. District Court

Linda J. Robbins, CSR, RDR, CRR

1      It is quite obvious what is going on with this

2   voicemail because they have later e-mails from Ms. Camina

3   attaching the transcript in which she tells her client,

4   here's what we need to do to try to prove who was the

5   author of changes made in the LoanForce database, we need

6   to go to the backup tapes, try to restore these particular

7   tables, and let Dr. Pooch compare them.

8      Now, that wasn't ever done, but there's no obfuscation,

9   there's no fraud, there's no tampering with evidence.   I

10   don't know where they get these things.   There is no way

11   that you can look at the information that is included

12   in the record and find that the failure to produce this

13   voicemail message was some part of a huge fraud on

14   Positive Software.

15      The last example that they gave was an e-mail from

16   Ms. Camina that attaches some mLAS code highlighted by

17   Dr. Pooch in which he found, quote, some similarity to

18   LoanForce on those -- on those two tables.   That should

19   have been produced.   Again, a mistake.

20      It's obvious, though, that it was Ms. Camina's intent

21   that it should be produced.   If you look in the upper

22   right-hand corner of the document in her own hand, she has

23   written, "To Dr. Pooch's file."   If it had been handled

24   properly, as it should have customarily been handled, it

25   would have been placed in Dr. Pooch's file.   When it came

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1    time to produce his file, it would have been there and it

2    would have been produced at that point.

3         I can't tell you why it got misplaced.  That kind of

4    thing happens.  It's regrettable.  But as Mr. Beck says, I

5    daresay that in any case, particularly one with as many

6    documents, as compressed and as contentious as this one

7    was, you would be able to find a slip in every case.

8         Positive has requested that the Court award attorneys'

9    fees as a sanction in this -- in this matter.  We believe,

10   Your Honor, because there was no sanctionable conduct, no

11   fraud, no bad faith, there should be no sanctions awarded

12   at all and therefore no attorneys' fees.

13        If the Court believes, however, that attorneys' fees

14   are an appropriate sanction, we would like to have the

15   opportunity to present some further information to the

16   Court for the Court's consideration.  But let me just say

17   a few words about it.

18        There are innumerable problems with Positive's proof

19   on attorneys' fees.  The main one is that Positive seeks

20   apparently to recover all of its attorneys' fees from the

21   beginning of the lawsuit in January of 2003 to the present.

22   It is Positive's burden to demonstrate the fees which it

23   incurred as a result of the alleged misconduct.  They did

24   not do that.  For that reason alone, their proof fails

25   completely.

1         Positive has made innumerable allegations in this case

2    that have not proven to be true.  Positive has made no

3    effort to segregate the fees that it incurred in making

4    its unsuccessful, untrue, unsubstantiated claims as it

5    has on any claims which the Court may be concerned about.

6         Positive has even asked for fees incurred in acting

7    as the Court's amicus in the show cause when they were a

8    volunteer.  There is no legal authority upon which Positive

9    could obtain recovery of their fees for acting in that

10   capacity.

11        Even if you get beyond all of these problems in the

12   method in which they have sought their fees, their proof

13   itself is inadequate and unreliable.  Out of the more than

14   a dozen lawyers who worked on this file, Your Honor, only

15   one kept any time records.  The rest, all we have are

16   guesstimates.

17        We don't even have any real analysis by those lawyers

18   of how they made their guesstimate of the time that they

19   spent from the beginning of the case to the end.  What we

20   are told in their declarations is, I looked at the docket

21   sheet, some of the file, and this seemed like the right

22   number to me.  There are dozens of attorneys' fee cases

23   rejecting that very type of proof as adequate.

24        I might even tell you that the proof is internally

25   inconsistent.  They have attached to the declaration of

Linda J. Robbins, CSR, RDR, CRR

Page 123

1    their attorneys' fee expert the testimony of the expert

2    that they used in the arbitration, a lawyer named Carl

3    Roth, who did a similar estimate, survey of the lawyers

4    who worked on the arbitration through January of 2004.

5         His handwritten estimate is part of the file that was

6    attached to Mr. Bragalone's declaration, and he says that

7    they had spent 7,950 hours prosecuting their claims through

8    the arbitration.  One answer, of course, to their request

9    to recover those fees through the arbitration is, again,

10   that they sought their fees in the arbitration proceeding

11   and they lost.

12        But if you look now at the proof that they submit to

13   this Court in support of their claim for attorneys' fees,

14   the number of hours that they have estimated for this 2003

15   case from the beginning to now is less than the 7,950 hours

16   that Mr. Roth put in his testimony as having been spent

17   prior to January of 2004.

18        It's those kinds of discrepancies that are created

19   when there is no corroboration, no backup, no support

20   for the request for fees.

21        We'd like to give the Court some of its time back.

22   And if the Court has questions about any of the other

23   allegations that Positive has made that we've addressed

24   in our pleadings, I'd be happy to answer them.  Otherwise,

25   I thank the Court for your patience and turn it over now

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    to Mr. Shore.

2              THE COURT:  All right.  Ten minutes.

3              MR. SHORE:  Your Honor, may I have a two-minute

4    warning?

5              THE COURT:  Sure.

6              MR. SHORE:  First of all, the other grounds of

7    sanctions in our papers are not abandoned.  We simply

8    didn't have time to produce them -- present them today.

9         A couple of points.  Norment found his November 9, 2000

10   version, quote, it was found in a directory on a server we

11   had not previously reviewed, closed quote.

12        The only Retail IT servers that were not reviewed were

13   the eight listed in the e-mail, including the Nitrogen and

14   Jaguar servers.  The Court has the directory of the hard

15   drive and can look itself at the LoanForce SQL, see the

16   file name, it's on the Nitrogen server.

17        The reason specific dates for a backup restoration were

18   even discussed as opposed to all programs and all versions

19   was because Ophelia Camina and Barry Barnett repeatedly and

20   falsely stated that no earlier versions existed even though

21   the VSS database had every single version of the program.

22        The following facts are absolutely undisputed:

23        LoanForce existed on a New Century server that, quote,

24   had not been previously reviewed, closed quote, one of

25   those eight servers listed by John Norment's e-mail, and

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

1      it existed there after the entry of the Preliminary

2      Injunction.   Undisputed.

3           And it existed there after the Court was told that

4      a complete purge had occurred.   It's undisputed that

5      Mr. Barnett and Ms. Camina knew this, they kept it a

6      secret, they did not inform the Court in violation of

7      Preliminary Injunction.   They did not inform the Court

8      that the purge never occurred.

9           In the prima facie brief at pages 33 through 34,

10     docket number 556, it's clear that Ophelia Camina actually

11     ordered John Norment to do the analysis.   There are multiple

12     e-mails between Ophelia Camina and the client where their

13     client is instructing her to -- in the letter to the Court,

14     instructing Mr. Barnett to make sure the Court understands

15     that it was ordered by outside counsel, not done by John

16     Norment on his own.

17          Barnett undisputedly did know about the Norment

18     comparison of the 11/09/2000 version of LoanForce to the

19     April '03 version of LoanForce, and he did not disclose it

20     when he had the opportunity to do so in January of 2004.

21     He knew that there's two Norment analyses, one on the

22     spreadsheet and the other in the e-mail.   He knew about

23     the one in the e-mail, he got a copy of it, he knew what

24     was being compared, and he never told the Court about it.

25          Positive Software did not know that an earlier version

Page 126

1    of the software had been produced on paper because Ophelia

2    Camina and Barry Barnett repeatedly represented, both to

3    Positive Software's counsel and to the arbitrator, that

4    the 11/21/03 production was the code currently being used.

5    That's what they said it was to the arbitrator, that's

6    what they said it was to us, at the same time they were

7    saying there were no earlier versions.

8         The 11/26/2000 version was not registered, Your Honor,

9    not because -- and this is the version that -- that -- it

10   was simply a Prospect table.  This is the 11/26/2000 version

11   that they claim was the version we already had.  It wasn't

12   registered for two reasons:  One, it was not complete; and,

13   two, we had no way to prove that we had ever given it to

14   New Century Mortgage.

15        It actually was called the AnyLoan Company SQL.

16   There was no proof ever in the case that it was given to

17   New Century Mortgage.  It was simply the earliest table

18   that we still had, and that was produced in response to a

19   request for anything related to LoanForce code that had

20   been provided to New Century.

21        It went with also the -- and there's an explanation of

22   what R-651 is.  Mr. Mandel has explained it.  It's quite

23   clear.

24        Let me talk about the Judy Etchison, what he put up on

25   the screen.  And I find this just amazing, Your Honor.  You

 1    can read -- you have in -- in your possession Ms. Etchison's

 2    entire arbitration testimony.  She's the one who used the

 3    word "original."  That's how she described the original

 4    version copyrighted.  That is so clear from her testimony

 5    when you take -- when you read the testimony.  She was

 6    talking about the originally copyrighted version.

 7        And as a matter of fact, Etchison testified on

 8    December 19th, declared on December 26th, and testified

 9    in the arbitration that the version she had, the one she

10    was calling the original version, was the same as the

11    copyrighted version.

12        The operative fact, Etchison filed a supplemental

13    report in August of '08 comparing the November 9, 2000

14    version to the registered version and they are the same.

15    Now, we had no way of proving that to the arbitrator that

16    they were the same because they didn't give us the 11/09

17    version.

18        All right.  They talked about in the VSS logs being

19    produced in this stack (indicating).  The VSS logs are not

20    the VSS database.  The VSS database for LoanTrack-2 and

21    mLAS could have been restored, could have been produced.

22    Camina and Barnett said don't.

23        The only versions of mLAS and LoanTrack-2 that they

24    produced were versions created in 2003.  They did not

25    produce the earliest versions.  You need the early versions

Linda J. Robbins, CSR, RDR, CRR

1    to prove derivation, because when you're proving derivation

2    from LoanForce, you have to show the earlier versions are

3    closer to LoanForce and then multiple additional versions

4    take place to where ultimately they don't look as much like

5    LoanForce when you get all the way to 2003.

6        And you saw the e-mail where they actually talked

7    about there were still a couple of tables in LoanTrack-2

8    that looked like LoanForce, but they would take care of

9    that in the next release.  So they knew what they were

10   doing by not giving the earlier versions that could have

11   been restored from the VSS database.

12       As to why didn't we prove mLAS, you know, in the

13   arbitration was the same.  Well, you know, that -- that's

14   very interesting.  We didn't have the documents showing the

15   taint and that they had misrepresented all of the access

16   to LoanForce until the attorney/client privilege had been

17   waived and the bankruptcy case had been done.  We didn't

18   have that material.

19       They testified -- in fact, Dr. Pooch testified that

20   mLAS had -- he didn't see any -- any similarities between

21   mLAS and LoanForce.  Of course, if we had had the document

22   where Dr. Pooch actually did note the similarities, the

23   cross-examination may have been a little bit more effective.

24       As to Etchison and her notes--and I think that's

25   interesting that they would bring that up--Etchison had

 1    never before served as an expert.  Ever.  When she was asked

 2    in a deposition, are there any other documents that have

 3    ever been created that ever contained any of your opinions,

 4    she didn't do what Dr. Pooch did and lie, she told the

 5    truth, which is why she got cross-examined on it, which

 6    why they knew about it and cross-examined her at the

 7    arbitration proceeding on the fact that some of her early

 8    notes she had discarded.  Because she told the truth.

 9        So I think it's very interesting that Judy Etchison,

10    who had never been an expert before in her life, tells the

11    truth to the same question Dr. Pooch is asked when he lied,

12    and they are now criticizing us for having an expert to

13    tell the truth and give them the opportunity to cross-

14    examine her on her mistake.

15        As to the fee burden, first of all, this misconduct

16    started from the very beginning.  And as you saw in our

17    presentation, the documents where this conspiracy started,

18    it started in March of 2003 and, frankly, it went on until

19    today.

20        The cover-up documents I think, which they didn't

21    address, they didn't address at all the fact that constantly

22    they were being reminded, the attorneys knew that mLAS was

23    tainted, they knew it was tainted and there was a plan to

24    keep it out of the injunction.  And even when they found

25    out it was tainted, even when they found out that the

Linda J. Robbins, CSR, RDR, CRR

1   programmers of mLAS were actually the database

2   administrators for LoanForce, they never came back and

3   told the Court and they never told us.  That is active

4   participation in a fraud or a cover-up.

5        The laws of our profession are built upon an assumption

6   of integrity.

7              THE COURT:  Two minutes.

8              MR. SHORE:  That assumption is confirmed when a

9   lawyer tells a client, no, I will not tolerate deceit or

10  engage in its practice.  Conversely, when a lawyer engages

11  in deceit, actively or by acquiescence, he or she surrenders

12  the assumption of integrity for both himself and his

13  profession and stands exposed.

14       At that point the legal profession is faced not with

15  a choice but an obligation.  It must condemn and punish

16  its members who defile the Bar through deceit.  Each time

17  a lawyer's personal failure of integrity is allowed by

18  forgiveness or excuse, the profession itself shudders,

19  its disease apparent, and if untreated, becomes fatal.

20       These lawyers, Ophelia Camina and Barry Barnett, have

21  proven themselves to be completely lacking in integrity.

22  They have connived, schemed, conspired, and actively engaged

23  in conduct that any member of the Bar would find repulsive

24  if the names of the perpetrators were Smith from Garland or

25  Jones from Mesquite.  The fact that they work for Susman

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1    Godfrey does not give them elevated protection and it does

2    not give them the ability to stand immune.

3         They stand unrepentant and arrogant until today before

4    this Court.  To Camina and Barnett, all the other lawyers

5    like them, the rules are for suckers, Boy Scouts, fools,

6    true believers.  For lawyers like Barnett and Camina, the

7    ends always justify the means.  Their firm motto says it

8    all:  Winning is everything.  Some of us know better.

9         By this Court's decision, integrity can be restored

10   to our profession and a great injustice can be recognized,

11   though never completely undone.

12        There are two audiences expectantly awaiting what

13   will come.  The first audience is comprised of those who

14   believe.  They believe in the system and they believe in the

15   profession.  They still see this place as a place of ideals.

16        The other audience is more cynical.  That audience is

17   comprised of two people:  the victims of people like Barnett

18   and Camina and the perpetrators.  The perpetrators are

19   watching.  Lawyers like Camina and Barnett are waiting for

20   the signal, a sign that their vision of the legal profession

21   will be, if not welcomed, at least excused and tolerated,

22   enabled by an indefinite or feeble response.  They are

23   looking for a wink, a nod.

24        Ed Mandel and Positive Software ask this Court to

25   render the severest possible sanctions both in this case

1    and the show cause proceeding.  Nothing less will deter the

2    perpetrator class or serve to restore their past victims'

3    trust.

4         I do not ask the Court for what I believe is too much.

5    I have personally in the federal courthouse in Dallas

6    refused a client's request to hide and suppress evidence

7    and then sat back after leaving the representation and

8    watched another lawyer collect a $40 million fee.

9         Money is not everything.  What is everything is

10   protecting the integrity of ourselves, our system, and

11   protecting people like Ed Mandel from people like Barry

12   Barnett and Ophelia Camina.

13              MR. PHELAN:  May I be heard?

14              THE COURT:  Regarding?

15              MR. PHELAN:  Just to be heard, Your Honor.

16              THE COURT:  Sure.

17              MR. PHELAN:  Your Honor, this -- this makes my

18   stomach hurt as I'm sure it does yours.  It's -- it's --

19   it's scary.  You are a judge who -- who is smarter than I

20   am and -- and you are fair and you're nice and you've got a

21   hell of a burden.

22        When I look at this case, all I can see is, there but

23   for the grace of God.  We have seen a -- a blinding blizzard

24   of blown-up snippets tossed up on the board today, woven

25   together to make a breathtaking charge of a level of conduct

1    from the beginning to the end, it is still continuing, the

2    fraud is now a cover-up, the conspiracy is ongoing.

3         It's way too much, Your Honor.  Dr. Pooch,

4    Ms. McCarthy, Malovos, Barnett, Camina, Gardner--they're

5    all liars, they're all cheats.

6         What we all know, though, is that there isn't a perfect

7    lawyer, including those on my left.  They've made mistakes,

8    too, producing the, quote, as-produced software saying that

9    was the as-produced software and then saying, no, it wasn't.

10   That was a mistake.

11        Saying they didn't have the November 9 software when

12   their expert had it, saying just now that their expert used

13   the word "original" to mean copyrighted when the testimony

14   that we showed you and that you have has her saying, I

15   compared the original to the copyrighted, but they did

16   not produce that comparison.  Was it a mistake?

17        I expected foolishly, when we to our surprise found

18   the Etchison testimony and the hard copy of the script, that

19   we would hear a bit of a mea culpa when we came in here.

20   Yes, we had it, I thought they might say.  Yes, we gave it

21   to our expert.  Yes, she analyzed it.  Yes, we failed to

22   produce her analysis or her notes.  Yes, our conduct was

23   imperfect, too.  But we heard none of that, that he who is

24   without sin.

25        Let me talk technically--well, that's not right; I

1   won't do that--about a piece of evidence, the November

2   software and where Mr. Norment found it.  You were told

3   that it was found on the Nitrogen server.  You were shown

4   a blown-up snippet.  Mr. Fogler directed your attention to

5   it.

6       The snippet is not dated November 9.  It's not the same

7   size.  It doesn't say LoanForce.  So where did he find it?

8   It wasn't that.  That was not what he found.  We know that

9   much.  We don't know where he found it.

10      We're told with great indignation that he perjured

11  himself when he said he only had access to it on images or

12  backups.  Why wouldn't this have come from a backup that

13  was restored?  Who says that could not have happened?

14      We don't know, but we don't have a perjury case here,

15  much less a subornation case.  And saying that the clean

16  room was infected is just a guess.

17      What we know about the software that was targeted, the

18  accused software, is that it did not infringe.  And we know

19  that there was a complete failure of proof by Positive at

20  the hearing, a failure to make the side-by-side comparison.

21      So even if someone who worked in the clean room once

22  had access, we don't know how much, to LoanForce, what the

23  end product was was noninfringing.

24      I want to talk about Barry and Ophelia and two

25  particular things that seem to have concerned you.  One is

1   whether Barry's November letters to you about the purge

2   were true or false and whether he -- if they were false,

3   he should have remembered what he had said and said so to

4   you.

5        I think the Court would have to agree, everyone in

6   the courtroom would have to agree, that it was reasonable

7   for Barry Barnett to rely on his client and his experts in

8   representing to the Court what he did was just what he had

9   been told, there has been a purge.

10       He did later, months later, learn that LoanForce or

11  what was said to be LoanForce was found somewhere.  Well,

12  of course.  Images were made of all of the servers.  You

13  could find LoanForce without the purge having been

14  imperfect.  That's point one.  You don't immediately snap

15  to the conclusion that the purge is imperfect just because

16  somebody finds LoanForce when servers are being restored

17  right and left.

18       Second, a lot had --

19            THE COURT:  Well, forgive me for interrupting

20  because I know you're about to wrap up.  But Mr. Norment,

21  when he conveyed that to Ms. Camina, specified where he

22  found it, and it wasn't from a backup.  It was from a

23  server that they hadn't reviewed before.

24            MR. PHELAN:  But --

25            THE COURT:  So I don't know that that argument

1   works.

2           MR. PHELAN:  Well, but a server that hasn't

3   been reviewed has been backed up.  I -- I -- I don't -- I

4   don't think that it necessarily follows that what he found

5   it on was anything other than a tape.  He had backups of --

6   of all of those servers.

7       The second thing is months had passed, Your Honor, from

8   April.  And I know that -- that I certainly don't remember

9   every letter I write in a case, not every word of it.  And

10  in a case of this magnitude where as much is going on as

11  was going on, I don't think the Court can fairly reach the

12  conclusion that Barry Barnett should have recalled exactly

13  what he said, should have concluded that it was false, and

14  should have reported it to the Court.  I certainly don't

15  know that I could have.

16          THE COURT:  But this wasn't just a stray comment.

17          MR. PHELAN:  It was one of a whole -- several

18  letters, Your Honor, and a lot of back and forth and there

19  were hearings.  It was not -- yes, it was not stray, and

20  he has been direct about that:  I wrote it believing it

21  to be true for the stated purpose of trying to avoid the

22  injunction sought.  No question about that.

23      But to say that he was on notice and aware and actively

24  aware, you know, it was in my mind, on my gosh, my letter

25  was wrong, there is just no proof of that.  It takes a --

1   a -- a giant leap, and it's not the kind of thing this

2   lawyer has made his career doing.  It was a mistake for

3   which he has apologized, but that's all it was, Your Honor.

4       And as for Ms. Camina's withholding evidence, I think

5   we know that she kept raising the issue of what should be

6   done with the November software, unaware that a paper copy

7   of it had been produced, and then she went off to try

8   another case.  She believed that the VSS logs were all

9   that had been requested and produced then.

10      Yes, she, like these lawyers to my left, did not

11   produce all that their expert had.  But those are the kinds

12   of mistakes that you could find in any case, Your Honor.

13   And while Positive's lawyers have had an opportunity that

14   none of us will ever have to get the privileged files of

15   their adversaries, sift through them, withhold most of that

16   from the other side so we don't even know what they're

17   sifting through, and then pull things out and out of context

18   argue that great crimes have been committed, and they've

19   argued it effectively -- in fact, I don't think that you

20   could find a case handled by the best lawyers that come

21   before you which have turned upside down that way would

22   not yield ammunition for similar arguments.

23      These lawyers have suffered, Your Honor.  If -- if the

24   Court wishes to get their attention, you've done it.  If

25   you wish for their conduct never to be repeated, you've got

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 138

1    it.  It's a heavy, heavy job, but the right one, the right

2    result here, Your Honor, is to say, "Enough."

3         Thank you.

4              THE COURT:  Mr. Shore, do you want to respond?

5              MR. SHORE:  I think I've said everything that

6    needs to be said, Your Honor.

7              THE COURT:  All right.

8              MR. SHORE:  I would like to make one clarification

9    to the record because I do want to be fair.

10        We have had a preliminary look at the paper copy.  And

11   although it is not identical, it is very, very close and

12   many of the tables and columns in it are from November 9.

13   There are also some from as far back as 1998, but, I mean,

14   they are -- it definitely has large components, large -- a

15   majority of the components and the one that John Norment

16   found.

17        So I want to make sure that that's -- we have only had

18   it for two days, but I wanted to make sure the Court knew

19   that.

20             THE COURT:  All right.  I'm going to take the

21   Positive Software piece under advisement.

22        With regard to the disciplinary proceeding, I am

23   terminating the disciplinary proceeding.  I find that no

24   discipline is warranted.  And in large part this is based

25   on my review of the documents.

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

1        As I mentioned at the earlier hearing, I found some

2    of the statements in the respondent's affidavits to be

3    facially implausible when I looked at them.  And on review

4    of the documentation, I think they are plausible and find

5    that I am unable to conclude with the requisite degree of

6    certainty that there was any culpable mental state.

7        And therefore, as I've indicated before, I find

8    imposition of any sanctions is not appropriate and I am

9    concluding that proceeding.

10       The other matter will be under advisement, and I will

11   try to let you know whatever I'm going to do on that as

12   soon as I am able.

13       Anything else to take up today?

14            MR. BECK:  Nothing from us, Your Honor.

15            MR. SHORE:  No, Your Honor.

16            THE COURT:  All right.  I appreciate you-all

17   coming down.  I hope you have a pleasant holiday season.

18   The Court will stand in recess.

19            MR. BECK:  Thank you, Your Honor.

20       (The proceedings were concluded.)

21

22

23

24

25

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 140

1                         I N D E X

2                                                    PAGE

3    ARGUMENT OF COUNSEL:

4         MR. SHORE ....................................   3

5         MR. BECK .....................................  80

6         MR. FOGLER ................................... 101

7         MR. SHORE .................................... 124

8         MR. PHELAN ................................... 132

9

10   FINDINGS OF THE COURT ............................. 138

11

12   MOVANT'S EXHIBIT INDEX ........................... 141

13

14   RESPONDENT'S EXHIBIT INDEX ....................... 142

15

16   REPORTER'S CERTIFICATION......................... 143

17

18

19

20

21

22

23

24

25

Linda J. Robbins, CSR, RDR, CRR

Page 141

1                    MOVANT'S EXHIBITS INDEX

2                                                    (EXCLD)

3    NO.             DESCRIPTION              OFRD   ADMTD

4

5    1      Copy of New Century Certificate      9

6           of Compliance                       43     44

7

8    2      Discovery Production Disk of Code    9

9           from New Century Mortgage           43     44

10

11   3      Discovery Production Disk of Code    9

12          from New Century Mortgage           43     44

13

14   4      Discovery Production Disk of Code    9

15          from New Century Mortgage           43     44

16

17

18

19

20

21

22

23

24

25

4d9cbb1d-50c5-4681-8e14-d8625bac3d21

Linda J. Robbins, CSR, RDR, CRR

Page 142

1                    RESPONDENT'S EXHIBITS INDEX

2                                              (EXCLD)

3    NO.              DESCRIPTION              OFRD   ADMTD

4

5     1    Copy of Records Produced           104    105

6          November 21, 2003

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

U.S. District Court

Linda J. Robbins, CSR, RDR, CRR

Page 143

1

2                          CERTIFICATION

3

4       I certify that the foregoing is a true and correct

5   transcript from the record of proceedings in the above-

6   entitled matter.   I further certify that the transcript

7   fees format comply with those prescribed by the Court

8   and the Judicial Conference of the United States.

9

10      s/Linda J. Robbins        Date:   December 22, 2008

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4d9cbb1d-50c5-4681-8e14-d8625bac3d21